E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
DAVID W. WILLIAMS (Cal. Bar No. 295204)
Assistant United States Attorneys
    Major Frauds/Appeals Sections
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012]
    Telephone: (213) 894-0756/8485
    Facsimile: (213) 894-6265
    Email:   valerie.makarewicz@usdoj.gov
           david.williams3@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:21-cr-00127-MCS |
|---|---|
| Plaintiff, | APPLICATION FOR ORDER TO COMPEL TESTIMONY OF JENNIFER KELLEN AT TRIAL; DECLARATION; EXHIBIT; [PROPOSED] ORDER |
| v. | |
| DOUGLAS J. CHRISMAS, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Valerie L. Makarewicz and David W. Williams, hereby applies to this Honorable Court for an order compelling JENNIFER KELLEN to testify at the trial of defendant, DOUGLAS J. CHRISMAS, at his trial on May 28, 2024.

    This application is based on the attached memorandum of points and authorities, the attached declaration and exhibit, the files and records in this case, and such further facts and argument as the Court may permit.

| | | |
|---|---|---|
| Dated: May 13, 2024 | | Respectfully submitted, |
| | | E. MARTIN ESTRADA<br>United States Attorney |
| | | MACK E. JENKINS<br>Assistant United States Attorney<br>Chief, Criminal Division |
| | | */s/ Valerie L. Makarewicz*<br>VALERIE L. MAKAREWICZ<br>DAVID W. WILLIAMS<br>Assistant United States Attorneys |
| | | Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Jennifer Kellen (Kellen) has been subpoenaed to testify before this Court on May 28, 2024. Counsel for Kellen has advised that if she is called to the stand, she will refuse to answer questions, invoking spousal privileges, as she stated she is married to defendant. Neither Kellen nor defendant have provided evidence of a valid state marriage license, after repeated requests from the government. The government interviewed multiple witnesses and reviewed other evidence that calls their marital status, if any, into question.

In the government's case-in-chief, the government intends to ask Kellen about three emails authored by Kellen directed to the comptroller of Ace Gallery and will not ask about any spousal communications pertaining to the emails with defendant, only about Kellen's own statements made in the emails. Pertaining to the adverse statement privilege, if proof of a valid marriage is produced, the court should inquire whether the marriage was still in existence on the date of the communication, as the government knows the parties do not reside with each other and public documents exist that show defendant is single.

**II. STATEMENT OF FACTS**

During 2013 through 2016, Kellen worked for defendant at Ace Gallery's second location in Beverly Hills. Declaration of AUSA Valerie L. Makarewicz ("Decl.", ¶ 2). In 2014, she authored two emails and gave directions to an employee of Ace Gallery pertaining art sales. Id.; Exhibits 21 and 22. Exhibit 23 is the result of directions Kellen gave to the Ace Gallery employee in Exhibit 22, and

1  Kellen is copied on the email, as she instructed the employee in
2  Exhibit 22. Id.; Exhibit 22, 23.  The government requested the
3  admission of these email by defendant, which understandably he
4  declined, but agreed to authenticity. Decl., ¶ 5.  Therefore, the
5  government subpoenaed Kellen through her attorney, Errol Stambler,
6  who stated that Kellen will not testify against her husband. Id., ¶
7  3.
8      Defendant and Kellen do not reside in the same household. Id., ¶
9  6. The government asked David Richardson, former counsel for the
10 committee of unsecured creditors, if, in the defendant's bankruptcy
11 litigation, defendant had provided a copy of a marriage certificate
12 to the parties/court, and Richardson stated he had not seen one. Id.,
13 ¶ 7. The government interviewed Scott Schaefer, the individual listed
14 as a member of the board of trustees for Ace Museum (who was not on
15 said board), who stated that Kellen mentioned to him in passing that
16 she and defendant got married in 2019, which surprised him. Id., ¶ 8.
17 The government has reviewed public records at different times
18 throughout this case pertaining to both defendant and Kellen and have
19 not found proof of any marriage between the two. Id., ¶ 9.
20 Furthermore, as the court is aware, defendant sold property in
21 December 2023 – as stated on the deed, defendant was listed as a
22 single man. (ECF 120 at 12.)
23     The government asked Kellen for proof of a valid state marriage,
24 and to date, none has been provided. Id., ¶ 4.
25     The government has stated to both defendant (on April 29, 2024)
26 and Kellen (via email to Stambler on May 8, 2024), that it intends to
27 ask questions of Kellen about the statements she made to Lauren
28 Gullotta, also an employee of Ace Gallery, contained in three emails.

Id., ¶¶ 4, 5. The government will not ask Kellen about any communications with defendant pertaining to the emails Kellen authored and provided those emails to Kellen to review. Id., ¶ 4.

### III. ARGUMENT

#### A. Spousal Privileges

Federal law recognizes two privileges related between spouses.

The marital communications privilege protects statements or actions that are intended as confidential communications between spouses, made during the existence of a valid marriage, United States v. Strobehn, 421 F.3d 1017, 1021 (9th Cir. 2005), unless the marriage had become irreconcilable when the statements were made. See United States v. Murphy, 65 F.3d 758, 761 (9th Cir. 1995) ("Separation and irreconcilability are questions of fact determined by the district court."). Either spouse may invoke the marital communications privilege and the protection it affords to statements made during a marriage survives the marriage. See United States v. Lustig, 555 F.2d 737, 747 (9th Cir. 1977); United States v. Fomichev, 899 F.3d 766, 771 (9th Cir.), opinion amended on denial of reh'g, 909 F.3d 1078 (9th Cir. 2018).

The spousal adverse testimonial privilege, on the other hand, prohibits one spouse from testifying against the other in criminal cases during the course of their marriage, and "the witness-spouse alone has a privilege to refuse to testify adversely." Trammel v. United States, 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The spousal testimonial privilege ends when a marriage ends. United States v. Marashi, 913 F.2d 724, 729 (9th Cir. 1990).

     **B.    Proof of a valid state marriage is necessary to invoke either spousal communication or adverse testimony privilege.**

Despite requests, the government has not been provided any proof of a marriage between defendant and Kellen—and testimony and evidence its reviewed calls into question the existence of the marriage. Decl., ¶ 4. The government asked several witnesses both with reasons to know of the existence of the marriage (Decl., ¶ 7), and those who would not, and received conflicting testimony (Decl., ¶ 8). As the court knows, public real estate records filed in 2023 state that defendant was "a single man."

     **C.    If a valid marriage is established, the government will not inquire as to spousal communications of defendant and Kellen.**

If a valid state marriage is established, the government does not intend to ask Kellen about any communications between herself and defendant, only about the statements she made in the emails between herself and the employee of Ace Gallery.

     **D.    A valid marriage on the date of the communication needs to be established in order for Kellen to invoke the adverse spousal privilege.**

If a marriage is established, the court should inquire of Kellen as to the state of her marriage to defendant on the date of the statements in order for her to invoke the adverse testimonial privilege.

Witnesses' privileges are inherent barriers to the fact-finding mission of trial courts. They operate to exclude relevant, probative evidence and run counter to the general proposition that each person must present all of the relevant evidence within his or her grasp. For this reason the Supreme Court directed that privileges be construed narrowly. United States v. Nixon, 418 U.S. 683, 94 S.Ct.

4

3090, 41 L.Ed.2d 1039 (1974). The marital privilege has been singled out from other privileges for especially harsh criticism. Much of the criticism stems from distaste for the paternalistic attitude toward marriage it reflects and doubt as to whether it serves any purpose. Wigmore complained:

> This privilege has no longer adequate reason for retention. In an age which has so far rationalized, depolarized and dechivalrized the marital relation . . . this marital privilege is the merest anachronism in legal theory and an indefensible obstruction to truth in practice.

8 Wigmore on Evidence § 2232 at 221.

McCormick leveled a similar criticism of the confidential communications privilege that is equally applicable to the testimonial privilege:

> "(A)ll privileges, in general, and this privilege for marital confidences in particular, are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly the movement should be toward restriction, and not toward expansion, of these mechanisms for concealment of relevant facts."

McCormick, Evidence § 79 at 165 (2d ed. Cleary ed. 1972).

In light of these criticisms, the court should consider whether the purposes of the privilege would be furthered by extending it to testimony by a third person. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), outlined two justifications for the spousal privilege: fostering marital harmony and avoiding the spectacle of pitting one spouse against the other. It is unlikely that either goal is served by excluding a spouse's out-of-court statements.

The Court should inquire as to the state of the marriage, if any, on the date of the communication (2014) between defendant and Kellen, as the privilege does not apply to parties where a marriage

no longer exists or are separated. If the parties are separated – the adverse testimony privilege does not survive and Kellen should be ordered to testify. See In re Grand Jury Investigation of Hugle, 754 F.2d 863, 865 (9th Cir. 1985); United States v. Lustig, 555 F.2d at 747; United States v. Roberson, 859 F.2d 1376, 1381 (9th Cir.1988).[1]

**IV. CONCLUSION**

The Court should order Kellen or defendant to produce a valid state marriage license prior to trial immediately if she will, on May 28, 2024, claim either spousal privilege.  If not produced, no spousal privilege can be invoked by Kellen, and the Court should order Kellen to testify about the three emails the government has identified.  If produced, the Court should order Kellen to appear and inquire as to the state of the marriage with defendant on the dates of the communications, as noted above.

---

[1] The Ninth Circuit follows an approach similar to that adopted by the Second Circuit. See In re Witness Before Grand Jury of Hugle, 791 F.2d at 238–39. The district court must first find that the husband and wife have been separated at the time of the communication. Id. (requiring "separation inquiry" by the district court). If the couple has been separated, the court should undertake a more detailed investigation into the irreconcilability of the marriage. It should consider all other relevant circumstances, including the duration of the separation and the stability of the marriage at the time of the communication. Id. at 238; United States v. Roberson, 859 F.2d at 1381.