MEGAN A. MAITIA (Bar No. 285271)
megan@summaLLP.com
JENNIFER L. WILLIAMS (Bar No. 268782)
jenn@summaLLP.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone: (213) 260-9455/52/56
Facsimile: (213) 835-0939

Attorneys for Defendant
DOUGLAS J. CHRISMAS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>DOUGLAS J. CHRISMAS,<br><br>     Defendant. | Case No. 2:21-CR-00127-MCS<br><br>**DEFENDANT'S MOTION TO DISMISS, OR FOR SANCTIONS, FOR PROSECUTORIAL MISCONDUCT**<br><br>**Judge:**  Hon. Mark C. Scarsi<br><br>**Hearing:** TBD<br><br>**Trial**: May 28, 2024 |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** as soon as this matter may be heard, Defendant Douglas J. Chrismas will and does move to dismiss the indictment, or in the alternative moves for sanctions, for prosecutorial misconduct.

      This motion is based on the attached Memorandum of Points and Authorities and declaration of counsel and supporting exhibits, the files and records in this case, all matters of which this Court may properly take judicial notice, any other evidence or oral argument as the Court may consider.

Dated: May 27, 2024

Respectfully submitted,
Summa LLP

 /s/ *Jennifer L. Williams*
Megan A. Maitia
Jennifer L. Williams

Attorneys for Defendant
DOUGLAS J. CHRISMAS

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

The Government has engaged in a pattern of flagrant misconduct.  It has presented false and misleading evidence to the Court; it withheld the actual (contradictory and exculpatory) evidence from the defense and the Court, while moving for detention; it has abused (and is continuing to abuse) its grand jury subpoena power; it is using an unenforced civil judgment (obtained in the face of Mr. Chrismas's exercise of his Fifth Amendment right) against him criminally; and it is improperly interfering with Mr. Chrismas's Sixth Amendment right to counsel.  Because Mr. Chrismas has not been afforded due process necessary for a fair trial, this Court should dismiss.

## II.  RELEVANT BACKGROUND

### A.  The Government Has Presented False and Misleading Evidence to the Court.

After 6:00 pm on Monday, May 6, 2024 (three weeks before trial), the Government moved to revoke Mr. Chrismas's bond.  (Dkt. 115.)  The basis of the request was Mr. Chrismas's sale of Tuna Canyon Property in December 2023.[1]  In its motion, the Government told the Court that Mr. Chrismas "hid" the sale from the "the government, and likely his creditors."  (Dkt. 115, p.6[2]).

The following night, after 10:00 pm on May 7, 2024, the Government supplemented its motion.  (Dkt. 120.)  There, the Government again told the Court that Mr. Chrismas "hid" the sale from the ACE Gallery bankruptcy estate; and that he kept the proceeds "rather than surrendering it" to the estate "consistent with" the estate's civil judgment

---

[1] The defense does not address or challenge the Court's finding of a violation of the relevant bond condition.  Rather, the defense addresses the false and misleading information and characterization presented by the government regarding the Tuna Canyon sale, which it now seeks to introduce at trial as "404(b) evidence." (*See* Dkt. 144.)

[2] Page references to Dkt. Filings are to the ECF page numbers.

against Mr. Chrismas. (*Id*. at 3.) The Government represented that the estate's civil judgment "compel[ed]" Mr. Chrismas to transfer the proceeds of the sale to the estate. (*Id*. at 4.) The Government attached, among other exhibits, excerpts from the escrow file for the sale of the Tuna Cayon property. (*Id*. at 5-12.)

On May 9, 2024, based on the government's application, the Court revoked Mr. Chrismas's bond and ordered him detained. (Dkt. 124.) Defense counsel applied for reconsideration of bond with certain conditions, (Dkt. 125, 133), and the Court set the hearing for May 13, 2024. (Dkt. 127.) Before the hearing, the Government filed an opposition and supplemental opposition, attaching as exhibits records from Mr. Chrismas's personal and business account, both from JPMorgan Chase. (Dkt. 132 at 11-17; Dkt. 136 at 7-12.) And, as it has done often in this case, the Government again cited to and quoted from the Bankruptcy Court's findings leading to the civil judgment the Government references (Dkt. 132 at 7, citing court findings from the bankruptcy case); these findings, as the defense has repeatedly stated, were made in the face of "undisputed" facts because Mr. Chrismas exercised his Fifth Amendment right. (*See* Dkt. 109 at 6 n.4; Dkt. 152 at 3 n.1.)

Only after the bond litigation, the Government produced the following discovery:

- <u>Produced on May 14, 2024</u> – An FBI 302 reflecting a May 7, 2024 telephone interview (no time noted) with Carolyn Dye, bankruptcy counsel for Plan Agent Sam Leslie.[3] Accordingly to the 302, Dye said she was aware of Mr. Chrismas's Tuna Canyon property; she did not know Mr. Chrismas had sold the Property; and the estate had taken no action to enforce the estate's judgment against that Property or any other assets. Dye never said that Mr. Chrismas was required to "surrender" the proceeds of the sale to estate or that

---

[3] The defense asked the Government to confirm the time of the May 7, 2024 interview with Dye (was it before or after the Government's 10:00 p.m. filing?). But the Government provided no response, and the Government has provided no information about how they discovered (or why they investigated in May 2024) the December 2023 sale, which has been a matter of public record for months, and why they opted to seek indefinite pretrial detention of Mr. Chrismas based on this sale just three weeks before the trial date.

the civil judgment "compelled" him to do so, and she never characterized the Tuna Canyon Property or the proceeds from the sale as "debtor assets." Indeed, she explained that if Mr. Chrismas received money from a sale, she'd have to first go through a debtor exam and civil procedure to enforce the judgment in a "debt collection proceed." (Williams Decl. ¶ 2, Exhibit A.)

- <u>Produced on May 14, 2024</u> – A May 9-14, 2024 email chain with the Government prosecutors, in which Dye confirmed that the Plan Agent (Leslie) "was pushing [her] to see what [Chrismas's] assets were," but that she "did not pursue it" after Mr. Chrismas did not voluntarily provide the information (when he explained to her that he was prioritizing preparing for this criminal trial). She did not try to notice a debtor's exam or otherwise seek legal means to enforce the judgment. (Williams Decl. ¶ 3, Exhibit B.)

- <u>Produced on May 21, 2024</u> – correspondence the Government had with IRS "Bankruptcy Specialist" Penny Hays on May 8, 2024 (before the detention hearings and later filings by the Government). Ms. Hays provided her case notes which said that Mr. Chrismas and his assistant contacted the IRS in November 2023 (before the sale of the Tuna Canyon Property) and *disclosed to the government* his intention to sell the property. (According to her case notes, Ms. Hays appears to have walked Mr. Chrisms through all the liens on the property, confirming which ones were active. Ms. Hays understood—as she discussed with Mr. Chrismas—that the Property would be sold prior to refiling any unexpired liens. She instructed Mr. Chrismas how to work with escrow to pay off the active lien.) (Williams Decl. ¶ 6, Exhibit C.)

Nowhere in the Government's discovery has anyone claimed that the sale was "hidden." (Indeed, the documents withheld by the Government *until after* the bond hearings show that Mr. Chrismas disclosed the sale to the IRS who had perfected certain liens against the Property.) The only basis for the Government's claims that Mr. Chrismas "hid" the sale from the estate is that he did not affirmatively tell Sam Leslie about the sale and did not voluntarily turn over all sale proceeds. But the Government points to nothing (no legal authority, no witness statement in discovery) that required Mr. Chrismas to

"surrender" the proceeds to the estate (or that doing so was "consistent with" or required by the judgment). Indeed, Dye states the opposite, noting that other liens on the property would be senior to any the estate would—but did not—have on the Property. Dye also confirmed that there is a debt collection legal process that the estate would have to—but did not—go through. The Government's repeated claims that Mr. Chrismas "hid" the Tuna Canyon sale are therefore false.

### B. The Government Is Abusing the Grand Jury Process to Obtain Evidence for the May 28, 2024 Trial.

The later-produced documents also revealed that the Government obtained the Tuna Canyon evidence—evidence the Government gave to the Court for the bond/hearings and now seeks to admit at the May 28 trial as 404(b) evidence—through grand jury subpoenas.

- On May 6, 2024, the Government contacted the escrow company used in the Property sale. AUSA Makarewicz said that she has "to serve a law enforcement subpoena" on the escrow company. The next day, AUSA Makarewicz emailed a document (the name of which the government redacts) to the escrow company asking for "a quick turn around."[4] (Williams Decl. ¶ 7, Exhibit D.) On May 7, 2024, AUSA David Williams directed an FBI agent serve a "subpoena" for the JPMorgan Chase account associated with the Tuna Canyon property sale and to do so "pronto." (Williams Decl. ¶ 7, Exhibit E.).) In a series of communications between May 8 and May 10, 2024, AUSA Makarewicz communicated with a JPMorgan Chase representative regarding "Grand Jury Subpoena Request / SB1582664-F1"; AUSA Makarewicz presses the bank for documents before a hearing scheduled for May 9, 2024 (when Mr. Chrismas was ultimately detained), and JPMorgan Chase provided records to the FBI agent that day, which he forwarded to AUSA Makarewicz with the subject line "GJS Response." (Williams Decl. ¶ 7, Exhibit F at Bates

---

[4] There is no reason to redact the name of the subpoena other than in support of the Government's position on grand jury secrecy (even though Federal Rule of Criminal Procedure 6(e) does not impose secrecy on recipients of grand jury subpoenas), and, of course, to cover up its abuse of the grand jury subpoena power.

38176 ("I have a 1030 court appearance tomorrow (Wednesday) and getting the bank statements for then would be helpful. Thank you, VLM").)

### III. LEGAL STANDARD

"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice." *United States v. Chu*, 5 F.3d 1244, 1249 (9th Cir. 1993). As the Supreme Court of the United States has explained:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape innocence or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) ("Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules.").

A court may impose the drastic remedy of dismissal of an indictment when the misconduct is flagrant and caused substantial prejudice to the defendant. *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988). "In cases involving prosecutorial misconduct which is neither flagrant nor prejudicial, a district judge can still sanction the misconduct,

5

DEFENDANT'S MOTION TO DISMISS, OR FOR SANCTIONS, FOR PROSECUTORIAL MISCONDUCT

but the sanction chosen must be proportionate to the misconduct." *Id.*; *United States v. Ross*, 372 F.3d 1097, 1111 (9th Cir. 2004) (prosecutors may be sanctioned even if their misconduct does not prejudice the defendant). "Sanctions may be necessary to punish prosecutors who fail to fulfill their duty 'to win fairly, staying well within the rules. *Id.* "[T]he judiciary—especially the court before which the primary misbehavior took place—may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events." *Kojayan*, 8 F.3d at 1325; *United States v. Williams*, 504 U.S. 36 (1992) (supervisory power "may be used as a means of establishing standards of prosecutorial conduct before the courts themselves.").

      Here, the Government has strayed from its responsibility that dismissal, or at least meaningful sanctions, are warranted.  This is not a case of "passive tolerance" of misconduct but rather "the conscious direction" of misconduct by the government lawyers prosecuting this case. *United States v. Simpson*, 813 F.2d 1462, 1468 (9th Cir. 1987) (identifying conscious direction of misconduct rather than passive tolerance, as a key factor in determine whether prosecutorial misconduct rises to the level of a due process violation):

      **First**: The Government has made knowingly false statements (statements with no factual or legal support) to the Court to ensure Mr. Chrismas would be detained pre-trial, harming his ability to prepare a defense.  Though all lawyers owe a duty of candor to the Court, the United States Attorney and senior deputies are charged with "ensuring that line [prosecutors] are aware of the special ethical responsibilities of prosecutors, and that they resist the temptation to overreach." *Kojayan*, 8 F.3d at 1324. Because "[m]uch of what the United States Attorney's office does isn't open to public scrutiny or judicial review," it is particularly important that the government discharge its responsibilities fairly, consistent with due process. (citing cases, dismissing indictment for, among other things prosecutors knowingly using perjured testimony); *see also Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (where false testimony is "in any way relevant to the case," the prosecuting attorney has the "responsibility and duty to correct what he [or she] knows to be false…[S]ilence

and elicit the truth."…"Silence" in the face of such false testimony, "prevent[s]… a trial that could in any real sense be termed fair."); *see also Hayes v. Brown*, 399 F.3d 972, 798 (9th Cir. 2005) ("the [government] violates a criminal defendant's right to due process of law when…it allows false evidence to go uncorrected when it appears"). Although *Napue* and *Hayes* speak to prosecutors' misconduct in not correcting witness testimony it knows to be false, such holdings must also stand for the (obvious) proposition that prosecutors must not present false evidence to the Court and must correct its own submission of evidence to the Court that it knows to be false.

**Second**: The Government is abusing the grand jury process to obtain discovery for trial. *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) ("[i]t is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial" and holding that the Court's supervisory role requires that it "ensure that the grand jury, a body operating peculiarly under court supervision [citation], is not misused by the prosecutor for trial preparation") (quashing grand jury subpoena for abuse of the grand jury process); *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972) ("the government should not use the grand jury for the sole purpose of pretrial discovery in cases in which an indictment has already been returned…We condemn any such conduct by the United States Attorney."); *In re Grand Jury Proceedings*, 632 F.2d 1033, 1040-41 (3d Cir. 1980) ("It is a firmly entrenched rule that once a defendant has been indicted, a prosecutor may not use a grand jury's investigative powers for the purpose of securing additional evidence against the defendant for use in the upcoming trial.") Post-indictment, the government must obtain discovery through Rule 16 or Rule 17, just like the defense.

Courts have warned that the abuse of the grand jury subpoena power "can form an important link in a chain of reversible prosecutorial misconduct." *United States v. LaFuente*, 54 F.3d 457, 461-62 (8th Cir. 1995). For that reason, courts have condemned the issuance of grand jury subpoenas for improper purposes, such as collecting evidence for a case already indicted or securing interviews outside the presence of the grand jury. *Id*. at

461 ("it is true that the use of subpoenas to secure ex parte witness interviews before trial is improper") (emphasis in original); *United States v. Martino*, 825 F.2d 754, 759 (3d Cir. 1987) ("Fed. R. Crim. P. 17 does not authorize the use of grand jury subpoenas as a ploy for the facilitation of office interrogation."); *In re Grand Jury Proceedings* 814 F.2d 61, 70 (1st Cir. 1987) ("a grand jury may not conduct an investigation for the primary purpose of helping the prosecution prepare indictments for trial").

Courts have looked to the timing of the subpoenas to determine the intent of the Government's conduct. *Simels*, 767 F.2d at 29 ("The timing of the subpoena casts significant light on its purposes[]"). The timing here supports a finding of misconduct. The government did not seek to obtain the at-issue records until three weeks before the trial (though such records have existed for months and could have been easily located and obtained—had the Government been intending to convene a new grand jury for an unknown purported crime—because the sale of the Property was public). The government could have used a trial subpoena (like the defense needs to do) in obtaining the records; but, of course, in doing so, they would have to notice the subpoena for the trial date, May 28, 2024. Because the government wanted the records "pronto"—not for a grand jury investigation but for a detention hearing (and for 404(b) evidence at trial)—it obtained the records by abusing the grand jury process.

Mr. Chrismas has been severely prejudiced by this misconduct. Not only was he detained in the face of the Government providing false and misleading evidence to the Court—evidence that was improperly obtained through grand jury subpoenas—he lost precious time in the last three weeks before trial to prepare. The government has engaged in "document dumps" on the defense – producing over 10,000 pages of discovery in the last three weeks. (Williams Decl. ¶ 8.) The defense has had to hunt for the buried documents that evidence the government's misconduct when it could have been preparing witness exams and arguments.

**Third**: The Government is using the guise of grand jury investigation to intimidate the defense and interfere with his choice of counsel, seeking a judicial inquiry into a non-

existent conflict of interest that the Court will hear on Day 1 of the trial. The Government has never disclosed why it investigated the Tuna Canyon Property when it did (to hide vindictive nature of the motion to revoke bond, and now purported criminal investigation into the sale itself).  This comes after their last-minute change in their theory of the case, their last-minute effort to "sanitize" their case by not calling long-time witnesses who the Government now realizes are problematic for their case, and their hope to (improperly) poison the jury and the Court with the bankruptcy court's $14 million judgment obtained in the face of Mr. Chrismas asserting his Fifth Amendment right in the civil proceedings.  Mr. Chrismas, now shaken from detention, witnessing the Government's misconduct, and fearful of losing counsel because of the Government's (unprecedented) claim of conflict, is heading into trial without the Constitutional protections he is afforded by the Constitution.

It is this cumulation of the Government's misconduct—the forest not the trees—that confirms the Government seeks to convict Mr. Chrismas in violation of his due process rights. Because the Government cannot be trusted to follow the (basic) rules imposed on prosecutors, who wield the weight and power of the federal government, Mr. Chrismas cannot proceed with a semblance of a fair trial. For these reasons, the indictment should be dismissed. At minimum, this prosecutorial team should be recused from the case. *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) (dismissal is particularly appropriate "as a prophylactic tool for discouraging future deliberate governmental impropriety of a similar nature.").

Dated: May 27, 2024

Respectfully submitted,
Summa LLP

 /s/ Jennifer L. Williams
Jennifer L. Williams
Megan A. Maitia

Attorneys for Defendant
DOUGLAS J. CHRISMAS