FD-302 (Rev. 5-8-10)

-1 of 2-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry      10/08/2023

    On October 7, 2023, Justin Bower, telephone number [REDACTED], email address bower@justinbower.com, was interviewed telephonically by Assistant United States Attorney (AUSA) Valerie Makarewicz and Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove.  After being advised of the identity of the interviewers and the nature of the interview, Bower provided the following information:

    Bower is an artist local to Los Angeles.  Between approximately 2011 and early 2013, Douglas Chrismas was Bower's exclusive art dealer.  Bower was introduced to Chrismas through a professor who was a mutual acquaintance of both men.

    During Chrismas' bankruptcy proceedings, well after 2013, someone associated with the proceedings contacted Bower and said that it looked like Chrismas contractually owed Bower approximately $200,000.  That amount of money was "massively significant" to Bower because Bower was still up and coming at the time it would have been owed.  It would have changed his life at the time.  Chrismas did pay Bower's some amount of money at some point, but it was not that much.  At the time of Chrismas' representation of Bower, it did not seem to Bower that Chrismas owed him this much.

    Bower knew other artists that Chrismas owed money to.  Bower thought there were other artists who were owed millions by Chrismas, including artists who had 20 year relationships with Chrismas.  Chrismas would sell artworks for a certain amount but then tell the artist that it sold for less than it actually did.  Getting money from Chrismas was like "pulling teeth."  Gary Lang had a stronger claim against Chrismas than Bower's did.

    Chrismas told Bower that a collector was potentially interested in Bower's artwork, but when Bower reached out directly to the collector, Bower learned that Chrismas had already sold Bower's artwork to the collector and had not told Bower.

    Bower simply considered his interactions with Chrismas as a financial loss and did not seek to take affirmative action to get what he was owed.

| | | | |
|---|---|---|---|
| Investigation on | 10/07/2023 | at | Los Angeles, California, United States (Phone) |
| File # | 374B-LA-3305940 | Date drafted | 10/07/2023 |
| by | Allen Grove | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

USAO_00027117

FD-302a (Rev. 5-8-10)

374B-LA-3305940

Continuation of FD-302 of  (U) Interview of Justin Bower (October 7, 2023) , On 10/07/2023 , Page 2 of 2

When the person from the bankruptcy contacted Bower, Bower sent records but nothing ever came of it.  Bower himself could not prove that Chrismas was "cooking books" and relied on the representation of the person involved in the bankruptcy.

USAO_00027118

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

FD-302 (Rev. 5-8-10)

-1 of 2-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    10/12/2023

    On October 10, 2023, Laurie Lipton, telephone number ███████, was interviewed telephonically by Assistant United States Attorney (AUSA) Valerie Makarewicz, AUSA David Williams, and Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove. After being advised of the identity of the interviewers and the nature of the interview, Lipton provided the following information:

    Lipton is an artist who moved to Los Angeles from Europe in or about 2011. Shortly thereafter, possibly in or about 2012, Douglas Chrismas had seen Lipton's artwork and asked Lipton to come over to see his gallery. Lipton recalled looking Chrismas up on the internet and what she found "didn't look great." Nevertheless, she met with Chrismas at his gallery which was so big that it reminded Lipton of a museum.

    Up to that point, Lipton had mostly made small artworks, because that is what was requested by European dealers and galleries. However, Chrismas told Lipton that he wanted her to make large artworks for him to sell. Lipton liked this because she always wanted to make large drawings. Lipton agreed to make large paintings for Chrismas to sell on consignment.

    Lipton did not know for what amount that Chrismas sold her work. Chrismas did pay Lipton some money. Chrismas did try to talk Lipton down from the amounts she wanted him to sell the artworks for, which "shocked" Lipton. Lipton had "no clue" what Chrismas was doing with her artwork. Lipton did contact Chrismas at point asking to retrieve payments and Chrismas replied that he would call her when artwork sold, which he did not in fact do. Lipton was living off of her savings at this time.

    Sam Leslie called Lipton in regards to Chrismas' gallery's bankruptcy. The bankruptcy situation was very convoluted to Lipton. She received large reams of documents, but could not afford to hire a lawyer so she simply set the documents aside.

    Lipton recalled that one big drawing by Lipton had disappeared so she asked Chrismas about it. Chrismas told her that the drawing was on loan.

Investigation on   10/10/2023   at   Los Angeles, California, United States (Phone)

File # ███████      Date drafted   10/11/2023

by   Allen Grove

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER**     USAO_00030299

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Interview of Laurie Lipton , On 10/10/2023 , Page 2 of 2

Lipton later learned from Leslie that Chrismas actually sold the drawing.

Lipton did not get paid from bankruptcy proceedings, but did get some artworks back, while many other artists did not. Lipton cannot hate Chrismas because he changed her life by changing the trajectory of her career and allowing her to make large artwork. Knowing Chrismas was artistically good for Lipton, but very stressful financially. The money Chrismas owed to Lipton would have been helpful in her life.

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER        USAO_00030300

ERIC WILSON
6025 Carnarvon Street
Vancouver B.C.
Canada V6N 1J9E

November 12, 2020

Jolene R. Tanner, Esq.
AUSA – Office of U.S. Attorney
300 North Los Angeles Street, Suite 7211
Los Angeles, CA   90012

      In Re:  Art & Architecture Books of the 21st Century, dba Ace Gallery
            Bankruptcy Case No. 2:13-bk-14135-RK

Dear Ms. Tanner:

      My name is Eric Wilson. I am currently 93 years of age and reside in Vancouver, British Columbia, Canada, where I have lived for almost 70 years. Along with two companies of which I am the sole shareholder, Wilson Administrative Services, Ltd. ("WASL") and Telford Building, Ltd., I am the largest single creditor of the Ace Gallery bankruptcy estate, holding combined general unsecured claims of $12.271 Million U.S., of which $750,000 is administrative, in addition to another administrative claim by way of a Bankruptcy Court approved loan to Mr. Sam Leslie, Plan Administrator, which currently stands at an approximate balance, as of the date of this letter, of $687,000. Copies of my original Proofs of Claim, along with the backup filed with each at the time the Claims were filed or acquired are all attached, although pursuant to a Settlement Agreement with Mr. Leslie and an Order entered by United States Bankruptcy Judge Robert Kwan on or about May 18, 2017 (copy attached), I agreed to waive or subordinate a portion of my claims against the estate and loan Mr. Leslie up to the sum of $1.05 Million on a secured and as-needed basis, in order to allow for the continued operations of the Debtor's estate, in exchange for certain consideration. As mentioned above, the balance on that loan currently stands at approximately $687,000. A ledger on the loan with Mr. Leslie can be provided should you wish.

      I have known Douglas Chrismas, who owned and operated Art & Architecture Books of the 21st Century, dba Ace Gallery ("Ace Gallery"), for approximately 50 years, and over the years purchased numerous works of art from him through Ace Gallery, as well as the predecessor galleries Mr. Chrismas owned and operated.

      My financial claims against Ace Gallery break down into a variety of different categories, which include unpaid consensual loans made by me to Ace Gallery, monies loaned to Ace Gallery which Mr. Chrismas diverted to other entities he controlled such as Ace Gallery New York or Ace Museum, all without my authorization, art sold by Ace Gallery through Mr. Chrismas on my behalf and without my knowledge or consent, for which I was not paid, Ace Gallery's unauthorized pledging of my art work, which was being held at Ace Gallery and

USAO_00028158
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

pledged as collateral by Mr. Chrismas for loans from pawn brokers, the proceeds of which Mr. Chrismas received directly without my knowledge or consent, and art work that was not actually what it purported to be, as the artist has refused to authenticate an item I purchased from Mr. Chrismas for the sum of $1.5 Million.

Additionally, several works of art held by Ace Gallery that I purchased from the Gallery which were being held on my account, turned up missing during an inventory performed on my behalf in late 2015, and the whereabouts of these works of art, consisting of approximately seven to eight pieces, remain unaccounted for, with no explanation provided by Mr. Chrismas as to what ultimately happened to any of these pieces, which I can only presume were sold to third parties by Mr. Chrismas with the money for each received by him or his gallery, and thereafter retained with no payment made to me, even though I had never authorized the sale of any of these particular items.

While I have never considered Mr. Chrismas a friend, I fully acknowledge conducting a fair amount of business with him through Ace Gallery, and as a patron of the arts I very much wanted his Gallery to succeed. It is for this reason that I had, from time to time in the past, loaned the Gallery funds at Mr. Chrismas' behest. I believe, however, that in connection with the Ace Gallery bankruptcy, as well as in the time leading up to it, Mr. Chrismas has committed serious fraud, not only defrauding myself and other creditors of the Ace Estate, but failing to notify any of the artists who held claims of the bankruptcy filing, even though the artists were creditors of the Gallery, clearly owed large sums of money and were entitled to know they were dealing with an entity in Chapter 11. His additional fraudulent acts during the bankruptcy include improperly identifying Ace Gallery's assets in its Bankruptcy Petition and in the Amendments it filed thereto, if they were identified at all. Further, Mr. Chrismas knowingly diverted hundreds of thousands of dollars that I loaned to the bankruptcy estate after Court approval had been obtained, to other entities he controlled, with no legal basis for doing the same.

Although Covid-19 restrictions prohibit me from traveling to Los Angeles to observe Court proceedings in the Ace Gallery bankruptcy case and the related litigation that has spawned from it, I continue to follow it closely and am very troubled by the fact that no criminal charges of any kind whatsoever have been brought to date against Mr. Chrismas for the serious illegal activities that I am informed and believe he perpetrated on not only myself and the estate's other creditors, but the Ace Gallery bankruptcy estate, as well as the United States Bankruptcy Court, for which I believe he should be incarcerated for the maximum time proscribed by law. For anything other than this result to transpire would seem to make a mockery of the American legal system and will encourage others like Mr. Chrismas who are intent on thumbing their noses at the entire bankruptcy system and playing by their own set of rules, not to mention taking advantage of those less sophisticated than themselves, or those simply foolish enough at times to trust someone they have done business with for so long, to replicate his outrageous conduct or worse, if that is even possible.

Although I am not able to meet with you in person in Los Angeles to discuss these matters, I would be more than happy to furnish you with any further documentation you might request, to the extent I am in possession of anything that would interest you, in addition, should

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

USAO_00028159

you wish, to arranging to speak with you telephonically or via Zoom conference or some other similar device now in use.

Additionally, my counsel in this matter, Alan Nahmias, practices law in the Los Angeles area, and I have authorized him to hold discussions with you, meet with you, or otherwise communicate with you in any way you see fit in the event that you would prefer to speak with him.

At this point in time, however, whether one looks at the Canadian legal system or that which is in place in the United States, nowhere would Mr. Chrismas' conduct be condoned and prosecutors, at least in Canada, would be lining up to gain the notoriety of being responsible for the conviction of someone of his ilk. Along those lines, I am hopeful that you can help me in pursuing justice not only for myself, but for all other victims/creditors of Ace Gallery and Mr. Chrismas by bringing criminal charges against him and thereafter seeing that he is fully prosecuted for all of the wrongful acts that he has committed against myself, other creditors of the Ace Gallery bankruptcy estate and the Bankruptcy Court, and once convicted be sentenced for whatever crimes he may be convicted of.

Thank you for your time in considering this correspondence.

Very truly yours,

*[signature]*
Eric Wilson

USAO_00028160
CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

FD-302 (Rev. 5-8-10)

-1 of 2-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    10/16/2023

On October 12, 2023, Robert "Bob" Sears, telephone number ███████, email address ███████, was interviewed telephonically by Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove. Also present on the call was Sears wife, Nancy Sears ("Nancy S."). After being advised of the identity of the interviewing Agent and the nature of the interview, Sears provided the following information:

Sears mother took an art class in the 1960's that was taught by artist DeWain Velantine. At some point, his mother acquired a large Valentine artwork called "Rockets." When Sears' mother died in 2011, Sears took possession of "Rockets." Sears asked an appraiser to bring "Rockets" to market without success. The appraiser recommended Douglas Chrismas as someone who had sold other Valentine artwork.

Sears went to Ace Gallery with a photograph of "Rockets." Chrismas told Sears that Chrismas could sell the artwork for $160,000; Sears had initially only expected to get approximately $20,000 for it. Sears brought "Rockets" to Ace Gallery on Wilshire Blvd. After that, Chrismas "went silent." Eventually, Sears went in and "Rockets" was not there. Chrismas told Sears that Chrismas sent "Rockets" off for restoration work, which Sears did not approve and did not think was needed. Sears could not recall if he interacted directly with Chrismas or someone in accounting. Sears "bugged" Chrismas incessantly about "Rockets." At one point Chrismas convinced Sears to extend their consignment agreement because Chrismas said he needed more time to sell. By this time, Chrismas seemed like a "flake."

At some point Sears contacted a lawyer for legal action against Chrismas. In approximately Summer 2014, Sears' attorney reached out to Chrismas to resolve the issue surrounding "Rockets." Sears also dealt with a police detective, considering the matter as a theft. Sears' issue with Chrismas resolved one day when a check from Chrismas arrived; it was less than $160,000 but possibly approximately $100,000. Sears would review his records for related documents. Sears thought the artwork was sold to an art aficionado's son in New York City, though Sears believes that "Rockets" is currently on display in a building in Century City, Los Angeles.

Investigation on    10/12/2023    at    Los Angeles, California, United States (Phone)

File # ███████                                              Date drafted    10/12/2023

by    Allen Grove

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of (U) Interview of Robert Sears (October 12, 2023) , On 10/12/2023 , Page 2 of 2

    Valentine told Sears that Chrismas owed Valentine money too. Valentine might help the government. Sears provided the following contact information for Valentine and Valentine's wife, Kiana:

- Phone numbers: ▓▓▓▓▓ [cell], ▓▓▓▓▓ [home]
- Email:
- Address: ▓▓▓▓▓ Gardena, California; Valentine had a studio in the South Bay and may have lived there or Palos Verdes.

    (Agent's Note: after the call, Sears sent SA Grove an email related to information dicussed during the interview. The email will be attached as a 1A package.)

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    10/16/2023

    On October 11, 2023, Melanie Pullen, telephone number ▆▆▆▆▆▆▆, email address ▆▆▆▆▆▆▆, was interviewed telephonically by Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove. After being advised of the identity of the interviewing Agent and the nature of the interview, Pullen provided the following information:

    Pullen was an artist that operated out in Los Angeles. In or about 2003, Pullen met Douglas Chrismas through her art world connections. Chrismas had been getting good "buzz" from shows that he put on. Pullen met Chrismas and he put Pullen "under his wing" as her art dealer.

    Chrismas helped Pullen's art career but lied to her about his sales of her artwork. Specifically, Chrismas lied about how successfully he was selling her artwork. Chrismas sold her artwork to his clients but would not pay Pullen commensurate with what he should have paid her.

    Chrismas always "strung" Pullen along when it came to her payments. Chrismas sometimes made the argument to Pullen that even though he made a sale, he did not have to pay her until the artwork physically left his gallery, despite the fact that he was already paid himself. Pullen was aware that Chrismas did not pay artists what they were owed and even believed that Chrismas did not pay Andy Warhol what Warhol was owed in a deal that he had with Warhol. Pullen reiterated that Chrismas was "corrupt" but that he did build her up in the art world.

    Pullen "worked out" a deal as a part of Chrismas' bankruptcy. At this point in the interview Pullen noted that she wanted to speak to an attorney before divulging any further information about the deal. SA Grove acknowledged her request and the interview was concluded. (Agent's note: following the interview, Pullen sent an email with further details related to the items discussed during the interview. The email will be attached as a 1A package.)

| | | | |
|---|---|---|---|
| Investigation on | 10/11/2023 | at | Los Angeles, California, United States (Phone) |
| File # | ▆▆▆▆▆▆▆ | | Date drafted   10/12/2023 |
| by | Allen Grove | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER    USAO_00030301

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of (U) Interview of Melanie Pullen (October 11, 2023) , On 10/11/2023 , Page 2 of 2

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER        USAO_00030302

| | |
|---|---|
| **From:** | Mel P (MP) |
| **To:** | Grove, Allen (LA) (FBI) |
| **Cc:** | Makarewicz, Valerie (USACAC) |
| **Subject:** | [EXTERNAL EMAIL] - Re: FBI Contact re: Douglas Chrismas |
| **Date:** | Thursday, October 12, 2023 1:02:56 PM |

Dear Ms. Makarewicz and SA Grove,

It was a pleasure to briefly speak with you yesterday, SA Grove. Ms. Makarewicz my apologies for the tardiness in my response; it appears your email was inadvertently overlooked. Thank you for both for granting me the time to consult with an attorney. I know time is of essence.

Here's a little background, in the course of dealing with the bankruptcy of Ace Gallery, (referred to in filings by its legal name, Art & ArchitectureI Books of the 21st Century), I learned that many of my works had been sold in the years past without my being paid, were unaccounted for, or were badly damaged.

With the kind assistance of the trustee, his team and my legal team, we were able to navigate vast web which ultimately led us to figuring out how to resolve various issues. In the end we worked out an agreement and settled. The settlement agreement contains a confidentiality clause which I do not want to violate.

Following my conversation with SA Grove, I consulted an attorney to clarify the constraints of the confidentiality clause in the settlement agreement I signed a few years ago. In light of this consultation, it has been confirmed that discussing the settlement would necessitate written consent from both the trustee and the insurance company involved. My legal counsel also indicated the possibility that a subpoena could possibly act as an official sanction for such discussions, without violating the aforementioned clause. This would, of course, be at your discretion to pursue.

Enclosed, you will find the relevant clause for your in-depth consideration.

*"19. Confidentiality: The Parties agree not to release any documents pertaining to the terms of settlement or this Agreement, and that the terms of this Agreement shall remain confidential and shall not be disclosed to anyone not a party to this Agreement, other than (i) any past, present or future insurer or reinsurer or their representatives and agents as well as any representative or professional advisor or agent of the Parties (ii) to the extent required to be disclosed in connection with the pursuit or defense of any proceeding or arbitration; (iii) to the extent otherwise required by law, absent the prior written consent of the parties signing this Agreement."*

I would greatly appreciate your assistance in coordinating with the trustee <u>Sam Leslie, the Bankruptcy/Plan Agent of Art and Architecture Books of the 21st Century (A&A)</u> and the insurance company <u>The Continental Insurance Company</u> to secure their official written authorization to have any discussions regarding the issues at hand. Once such written consent or a subpoena is obtained, I would be more than willing to engage in detailed discussions regarding the case.

Please understand that adherence to the confidentiality clause is of utmost importance to me, and I have no intention of breaching the agreement I have in place. Thank you for your proactive attention to this complex issue. I look forward to the possibility of advancing our discussion upon the necessary permissions being acquired and I hope to be of assistance.

Best regards,
Melanie Pullen

On Oct 12, 2023, at 10:13 AM, Allen Grove <agrove@fbi.gov> wrote:

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER                     USAO_00030303

Hi Ms. Pullen,

Thank you again for taking the time to speak to me yesterday. As we discussed, once you've spoken with your attorney please feel free to put him/her in touch with us. As I mentioned, we're looking at a short timeline with trial set to begin on October 24.

Regards,

-Allen

---

**From:** Grove, Allen (LA) (FBI)
**Sent:** Wednesday, October 11, 2023 12:04 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** FBI Contact re: Douglas Chrismas

Hi Ms. Pullen,

This is my contact information.

-SA Allen Grove

----

Special Agent Allen Grove
Federal Bureau of Investigation, Los Angeles Field Office
*Art and Antiquity Investigations*
(310)367-4615

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER          USAO_00030304

FD-302 (Rev. 5-8-10)

-1 of 2-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    05/24/2023

On May 23, 2023, Mary Corse Bridgman ("Corse Bridgman"), date of birth (DOB) ▮▮▮▮▮▮▮▮, cellular telephone number ▮▮▮▮▮▮▮▮, home address ▮▮▮▮▮▮▮▮, was interviewed at her residence by Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove. Also present for the interview was Assistant United States Attorney (AUSA) David Williams. After being advised of the identity of the interviewing Agent and the nature of the interview, Corse Bridgman provided the following information:

Corse Bridgman met Douglas Chrismas approximately 30 to 40 years ago in the 1980s or 1990s. Chrismas represented Corse Bridgman as an art dealer through his gallery, Ace, "on and off" during that time up until approximately five or six years ago. Ace was located near Wilshire Blvd. and La Brea Ave. in Los Angeles, California.

Chrismas sold approximately 50 artworks by Corse Bridgman during the course of their business relationship. Chrismas always sold her artwork through his gallery and not on his own.

Corse Bridgman believed that the contractual relationship between her and Ace Gallery paid her $10,000 per month against sales. During his representation, Chrismas was able to increase the prices that Corse Bridgman's artwork sold for. Chrismas did pay the monthly fee but Corse Bridgman "would have to fight" to get that monthly fee.

Approximately five or six years ago, Corse Bridgman stopped her relationship with Chrismas and Ace Gallery because Chrismas "stopped paying people." Corse Bridgman estimated that Chrismas sold $3 million worth of her art that he never compensated her for. As part of a legal agreement related to Chrismas' bankruptcy case, Corse Bridgman got back some of her paintings that were in Chrismas' possession, however Chrismas still has approximately ten of her paintings.

Corse Bridgman did not maintain records of her dealings with Ace Gallery, but believed that the representative on the bankruptcy case had those. Sam

Investigation on  05/23/2023  at  Topanga, California, United States (In Person)

File #  374B-LA-3305940                                    Date drafted  05/23/2023

by  Allen Grove

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

USAO_00030246

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

FD-302a (Rev. 5-8-10)

374B-LA-3305940

Continuation of FD-302 of (U) Interview of Mary Corse Bridgman (May 23, 2023) , On 05/23/2023 , Page 2 of 2

Leslie took over operations of Ace Gallery and would have records related to her sales at Ace Gallery.

Corse Bridgman has not spoken to Chrismas since the bankruptcy proceedings. Corse Bridgman did not know the name Henning Freybe. Corse Bridgman knows Michael Straus as a collector of her artwork.

USAO_00030247

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER

FD-302 (Rev. 5-8-10)

-1 of 1-

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry   10/24/2023

    On October 23, 2023, Armando Lerma, telephone number ▮▮▮▮▮▮▮▮, email address ▮▮▮▮▮▮▮▮, was interviewed telephonically by Federal Bureau of Investigation (FBI) Special Agent (SA) Allen Grove. After being advised of the identity of the interviewing Agent and the nature of the interview, Lerma provided the following information:

    Lerma worked with Carlos Ramirez on a collaborative art project called Date Farmer. Lerma met Douglas Chrismas in approximately 2009 after Chrismas contacted Date Farmer via email. Lerma was impressed by Chrismas because Chrismas had represented many renowned artists, and thought that it would be a "great opportunity" for them. Chrismas agreed to put on two shows for them at his galleries: first, in Los Angeles in approximately 2010, and second, in Beverly Hills in approximately 2015.

    They entered into a contractual arrangement whereby Lerma and Ramirez were paid monthly in exchange for them bringing their artwork to Chrismas. Lerma estimated their compensation began around $7,500 month, but dropped over time before Chrismas eventually stopped paying altogether. Lerma could not estimate how many artworks they provided to Chrismas.

    Lerma believed they were unpaid by Chrismas for artwork Chrismas sold; Lerma estimated it might be as high as $200,000 but was unsure of the actual number. After Chrismas declared bankruptcy, Lerma was contacted by Sam Leslie or Leslie's associates. Lerma and Ramirez were able to recover some of their art, but not all. Leslie sold some of the artwork to satisfy a portion of the bankruptcy. Lerma's primary contact at the art gallery was Joaquin Ramirez.

Investigation on   10/23/2023   at   Los Angeles, California, United States (Phone)

File #   ▮▮▮▮▮▮▮▮                                         Date drafted   10/24/2023

by   Allen Grove

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

CONFIDENTIAL INFORMATION -- CONTENTS SUBJECT TO PROTECTIVE ORDER                               USAO_00030261



## [EXTERNAL] Bovitz -- Gary Lang

| | |
|---|---|
| From | J. Scott Bovitz <bovitz@bovitz-spitzer.com> <bovitz@bovitz-spitzer.com> |
| Date | Sun 12/15/2024 1:13 PM |
| To | Makarewicz, Valerie (USACAC) <VMakarewicz@usa.doj.gov> |
| Cc | Williams, David (USACAC) <DWilliams@usa.doj.gov>; Fredric Greenblatt <fjg@greenblattlaw.com>; Grove, Allen (LA) (FBI) <agrove@fbi.gov> |

Valerie:

Good afternoon.

Again, we congratulate you and the team for your successful prosecution of Mr. Chrismas.

Gary Lang does not have a precise calculation of what he is still owed for his transactions with Mr. Chrismas and Art and Architecture Books of the 21st Century (Mr. Chrismas' chapter 11 corporation). Mr. Lang did say that (i) the amount of his claim could be as much as $1,000,000.00, and (ii) Sam Leslie (the chapter 11 plan agent) should have a more precise accounting if needed.

Mr. Lang is reluctant to consent to an interview. He has moved on with his life.

Thank you.

J. Scott Bovitz
Bovitz & Spitzer
1100 Wilshire Boulevard
Suite 2403
Los Angeles, California 90017-1961
(213) 346-8300
(213) 924-9293 mobile
bovitz@bovitz-spitzer.com

Board Certified
Business Bankruptcy Law
American Board of Certification

Certified Specialist
Bankruptcy Law