E. MARTIN ESTRADA
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0756
     Facsimile: (213) 894-6265
     Email:valerie.makarewicz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:21-CR-127-MCS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF VALERIE L. MAKAREWICZ; EXHIBITS |
| v. | |
| DOUGLAS J. CHRISMAS, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Valerie L. Makarewicz, hereby files its Sentencing Position.

///

///

///

///

///

///

The Sentencing Position is based upon the attached memorandum of points and authorities, the Presentence Report ("PSR") (ECF 224), the Victim Impact Statements (ECF 229), the files and records in this case, and such further evidence and argument as the Court may permit.

The government respectfully requests the opportunity to supplement its position or respond to defendant or the probation officer as may become necessary.

Dated: December 30, 2024          Respectfully submitted,

                                            E. MARTIN ESTRADA
                                            United States Attorney

                                            LINDSEY GREER DOTSON
                                            Assistant United States Attorney
                                            Chief, Criminal Division

                                            _/s/ Valerie L. Makarewicz_
                                            VALERIE L. MAKAREWICZ
                                            Assistant United States Attorney

                                            Attorneys for Plaintiff
                                            UNITED STATES OF AMERICA

**Table of Contents**

I.    INTRODUCTION....................................................1
II.   FACTUAL BACKGROUND..............................................2
III.  THE PRESENTENCE REPORT AND GUIDELINES CALCULATION..............4
IV.   LEGAL FRAMEWORK.................................................5
V.    THE GOVERNMENT'S REQUESTED SENTENCE.............................6
      A.    Nature and Circumstances of the Offense...................6
      B.    History and Characteristics of the Defendant.............10
      C.    Other § 3553(a) Factors..................................14
VI.   FINE & RESTITUTION.............................................15
VII.  CONCLUSION.....................................................16

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant embezzled millions of dollars from the Ace Gallery bankruptcy estate between 2013 and 2016. He was criminally charged for the final transactions in that series -- a $264,595 subset of the total. A jury found him guilty as charged. He has never shown any remorse.

Defendant first promised to return the money in April 2016, shortly after being caught. He never did. The estate then obtained a $14 million civil judgment against him. But he stonewalled, repeatedly insisting that he could not pay, telling the estate that he was "uncollectible," and refusing to allow it to conduct a financial examination. Consequently, to date, defendant has returned a grand total of $0 -- even though he received a $350,000 cash infusion in late 2023 (after selling land that he had maintained with money he embezzled from the estate), and even though (by his own admission) defendant's current income exceeds $450,000 per year.

Although the PSR correctly places defendant in criminal history category I, this is not even the first time he has engaged in similar conduct. In the 1980s, he was convicted of grand theft in state court; like here, he had had sold artwork that belonged to someone else, then pocketed the proceeds himself. Like the current case, it took almost 20 years for that victim to be made whole.

Nothing about defendant or this case warrants a downward departure or variance. Defendant caused harm, finally and emotionally, to dozens of creditors. But perhaps more important, defendant's years long fraud caused significant intangible harm upon

1

the Bankruptcy Court and its system, which rely upon truthfulness and honesty when appearing before it.

The Court should impose a Guidelines sentence, which the PSR correctly calculates (for offense level 32) at 121 to 151 months. The government respectfully requests a 121-month prison term, a $12,809,192 restitution award, and 3 years of supervised release.

## II. FACTUAL BACKGROUND

On February 19, 2013, Ace Gallery declared bankruptcy. When it did so, defendant (the president and CEO of Ace Gallery) reported that it had $9 million in total assets and $17.7 million in total liabilities. (Trial Ex. 15 ("Bk. Pet.") at 6.)

Defendant continued to manage Ace Gallery's day-to-day business (i.e., selling fine art) during the bankruptcy. He also embezzled $15.3 million, stealing the proceeds of Ace Gallery's art sales. Specifically, defendant redirected the proceeds from selling about 158 pieces of art away from Ace Gallery. (See Ex. 1, Case No. 2:22-cv-1265-PA, In re Art & Architecture Books, Dkt. No. 2 ("Bankruptcy R&R") ¶ 18.)

A detailed analysis of the transactions is attached. (See Ex. 1 (the Bankruptcy R&R) and Ex. 2 ("Ziegler Report"); Appendix 1 (summary table of embezzlements).)[1] Notably, defendant ultimately embezzled almost enough from Ace Gallery's art sales to repay all of its original liabilities combined -- $15.3 million embezzled vs.

---

[1] Some (but not all) of the transactions described in the Bankruptcy R&R and Ziegler Report include a reference to defendant's invocation of his Fifth Amendment rights. The government expressly does not rely on any such references, and the Court likewise should not rely on them. Even without those references, the loss analysis is complete.

2

1  $17.7 million in pre-petition liabilities.  (Ziegler Report at 21-22;
2  Bankruptcy R&R ¶¶ 546-551 & n.8.)[2]
3      Some of the money defendant stole was used to pay rent for Ace
4  Museum, a distinct entity and a 501(c)(3) nonprofit, which defendant
5  personally controlled.  For example, in 2013, defendant sold a piece
6  of Ace Gallery art called Flor De Incino for $172,000, then he used
7  $150,000 of the proceeds to pay for Ace Museum's rent.  (Ziegler
8  Report at 17.)
9      Some of the stolen money was used for other purposes too,
10 including defendant's personal expenses.  For instance, in June 2015,
11 defendant used $1,414 from Ace Gallery's bankruptcy estate to pay the
12 property taxes on a piece of land in Topanga Canyon, on which he held
13 title.  (See ECF 144 at 3-4 & Ex. A.)
14     Some of the stolen money was even repaid to Ace Gallery.  While
15 defendant embezzled $15,392,536 from art sales, he repaid about $2.5
16 million of it -- and in doing so, he made it seem as though some
17 entities that owed money to Ace Gallery were solvent and able to
18 repay their debts.  (See Section VI, Fine & Restitution, below.)  For
19 example, as described above, Ace Museum used $150,000 of the proceeds
20 from the Flor De Incino sale for its own rent.  But it then sent
21 $15,000 back to Ace Gallery, giving the appearance that it had assets
22 of its own, even though those assets really belonged to Ace Gallery
23 in the first place.  After accounting for these repayments, the net
24 amount of embezzled-but-not-repaid money was $12,809,192.

---

[2] Defendant also diverted millions in non-art funds, such as loans that should have gone to Ace Gallery's accounts but were instead sent to either Ace Museum or Ace New York. (See Ziegler Report at 22.)  Including those sums, defendant took almost $19 million out of the estate. (Id.)

With all this embezzlement, Ace Gallery failed to make headway in clearing its debts. So its creditors eventually asked the bankruptcy judge to appoint an independent trustee to manage the business, and the court did so, naming Sam Leslie to fill that role in early 2016.

However, before Leslie took over on April 6, 2016, defendant embezzled a final $264,595 from the estate: two transactions on March 30, 2016, and one transaction on April 1, 2016. Like many of the prior acts of embezzlement, these transactions were part of defendant's effort to use Ace Gallery money to pay the rent for Ace Museum.

The trustee confronted defendant about the final $264,595 embezzlement a few weeks later. Defendant (falsely) described it as a loan, and promised to pay it back. (See Ex. 3 ("Shemano Letter").) He never did. (See ECF 120, Ex. B.)

The bankruptcy judge eventually referred the matter for criminal prosecution, defendant was charged with the final $264,595, and in May 2024, a jury found defendant guilty of bankruptcy embezzlement.

### III. THE PRESENTENCE REPORT AND GUIDELINES CALCULATION

The PSR recommends placing defendant in criminal history Category I. (PSR ¶¶ 48-48.) It calculates a total offense level of 32: a base offense level 6 (USSG §2B1.1(a)(2)), plus 20 for a loss amount between $9.5 million and $25 million (USSG §2B1.1(b)(1)(K)), plus 2 for causing substantial financial hardship (USSG §2B1.1(b)(2)(A)), plus 2 for involving a misrepresentation or fraud during the court of a bankruptcy proceeding (USSG §2B1.1(b)(9)(B)). (PSR ¶¶ 24-41.)

4

The government agrees with this calculation, which corresponds to a Guidelines range of 121 to 151 months in prison. As explained in the government's previously-filed Objections to the Presentence Report, the loss amount is slightly lower than the amount identified in the original PSR, and the 2-point enhancement under USSG §2B1.1(b)(2)(A) is supported under USSG §2B1.1(b)(2)(A)(iii) (substantial loss, as identified by the PSR) and also by USSG §2B1.1(b)(2)(A)(i) (more than ten victims). (ECF 228). However, neither of these issues alters the ultimate Guidelines calculation.

**IV.  LEGAL FRAMEWORK**

A sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). There are four sentencing purposes set forth in Section 3553(a)(2): (1) just punishment or retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"); (2) deterrence ("to afford adequate deterrence to criminal conduct"); (3) incapacitation ("to protect the public from further crimes of the defendant"); and (4) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). See Rita v. United States, 551 U.S. 338, 348 (2007) (using these four terms); see also Gall v. United States, 552 U.S. 38, 50 n.6 (2007); cf. Tapia v. United States, 564 U.S. 319, 335 (2011) ("a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation").

In determining a sentence that complies with these four sentencing purposes, a sentencing court must consider the "nature and

circumstances of the offense and the history and characteristics of the defendant," the "kinds of sentences available," the Sentencing Guidelines range and Sentencing Commission's relevant policy statements, the "need to provide restitution to any victims of the offense," and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (3)-(7). When considering these factors, the Sentencing Guidelines range "should be the starting point and the initial benchmark." Gall, 552 U.S. at 49. Any deviation must be reasonable, and a "major departure" from the Guidelines range "should be supported by a more significant justification than a minor one." Id. at 50.

**V.   THE GOVERNMENT'S REQUESTED SENTENCE**

The Court should impose a Guidelines sentence of 121 months in prison.

**A.   Nature and Circumstances of the Offense**

The $12.8 million defendant stole would have paid most of Ace Gallery's debts. Instead, Ace Gallery was forced to liquidate its assets and go out of business. (PSR ¶ 28.) And defendant's creditors -- dozens of victims -- received fractions, at most, of what they were entitled to.

The Plan Agent recounts several creditors, artists, collectors, and a public educational institution, who defendant failed to pay, causing these persons signification financial and emotional harm. (ECF 229 at 9-10). Artist Justin Bower described the money defendant stole from him as "massively significant" and life changing. (ECF 228-3 at 1). Getting into business with defendant was a paradoxical situation — defendant was artistically good for artist Laurie

6

Lipton's career, but very stressful financially.  (Id. at 3; see also, id. at 1 ("Bower simply considered his interactions with Chrismas as a financial loss..."), id. at 10 ("Chrismas helped [Melanie] Pullen's art career but lied to her about his sales of her artwork."), id. at 14 ("Chrismas helped [Corse Bridgman's] art career but lied to her about his sales of her artwork."), id. at 16 ("[Armando] Lerma was impressed by Chrismas because Chrismas had represented many renowned artists, and thought that it would be a 'great opportunity' for them...Lerma believed they were unpaid by Chrismas for artwork Chrismas sold..."). As recounted by the attorney for the creditor's committee, an artist whose proceeds of sales from consigned artwork were converted by defendant "spoke of him as a bully who constantly made threats including lawsuits against any artist who dared to take issue with his conversion of the proceeds of sale of artwork they had consigned to him."  (ECF 229 at 118.)

Defendant also undermined the integrity of the court system itself.  As the bankruptcy judge observed, the court and creditors must rely upon a debtor's representations in bankruptcy proceedings.

> Defendant Chrismas's diversion scheme also did intangible harm to the bankruptcy system though (sic) his breaches of his fiduciary duties to the creditors of Art and Architecture Books of the 21st Century by ignoring his obligations of complete and candid voluntary disclosure of its financial affairs as an officer of a debtor-in-possession, forcing a costly investigation by the plan agent, the successor fiduciary, on behalf of the creditors to uncover Defendant Chrismas's embezzlement and conversion of bankruptcy estate assets.

(ECF 229 at 4.)  The Bankruptcy Court highlighted defendant's mindset at the time of filing bankruptcy – defendant never intended to be honest or forthright.

> [Defendant's] creation of a shell entity to siphon off bankruptcy estate funds before putting the corporation into

7

    bankruptcy was a <u>premediated exploitation of the bankruptcy system</u> to stymie the corporate debtor's creditors by restricting their nonbankruptcy collection remedies through the reorganization bankruptcy case <u>while shielding his unfettered control and use of corporate bankruptcy assets for his personal purposes</u> by diverting the assets to his shell entity, Ace Gallery New York Corp., and another controlled entity, Ace Museum, outside of bankruptcy, and <u>hiding his fraudulent diversions and dissipation of bankruptcy estate assets from the creditors</u> and the Bankruptcy Court by failing to disclose such diversions by not reporting the sales of corporate assets on the debtor's required monthly operating reports.

(<u>Id.</u> (emphasis added).)

Witness David Richardson, attorney for creditor's counsel, echoed the same sentiment at trial:

    BY MS. MAITIA:

        Q And you could have declined to meet with them [the government] for the several preparatory sessions you had?

        A I certainly didn't want to, I already made a criminal referral of my own. I wanted to see it pursued.

        Q   You spent five years of your life going after Mr. Chrismas?

        A No.

    MS. MAKAREWICZ: Objection. Form, argumentative.

    THE COURT: Objection sustained.

    BY MS. MAITIA:

        Q You wanted to help the government?

    MS. MAKAREWICZ: Objection, same.

    THE COURT: He can answer.

    THE WITNESS: I wanted to see the system protected. I have been working 30 years in this system. I believe in it. When someone abuses it the way I saw here, I wanted to stand up and protect it, yes.

8

BY MS. MAITIA:

    Q You wanted to help the government, yes, correct?

    A I wanted justice, yes.

(ECF 183 at 42:4-24.)

Bankruptcy only works if the parties are honest; for years, defendant had sole control over Ace Gallery's books and proceeds, and the creditors mostly had to take him at his word. His dishonesty, then, violated the fundamental premise and promise of bankruptcy proceedings. It also forced a simple matter to drag on for years beyond its sell-by date. Defendant's actions "thwarted its effective and cost-effective operation to protect the interest of creditors, resulting in costly investigation and litigation to uncover his fraudulent acts and diminishing the recovery for creditors." (Id.) Instead,

> [W]hile the parties and their counsel and the Bankruptcy Court were busily engaged in extensive and expensive litigating and negotiating activities in the bankruptcy case to work out disputes diligently and in good faith to reorganize the business of the debtor, Art and Architecture Books of the 21st Century, and to develop a confirmable plan of reorganization, unbeknownst to the parties and the Bankruptcy Court, at the same time, Defendant Chrismas, despite his being an officer of the court as a bankruptcy fiduciary, was busily subverting the bankruptcy reorganization efforts of the parties and the Bankruptcy Court in bad faith in depleting the bankruptcy estate by diverting and substantially dissipating its assets for his personal purposes, including his pet project, the Ace Museum, and making it difficult for the other parties and the Bankruptcy Court to detect his fraud.

(Id. at 4-5.)

If defendant had not embezzled, the bankruptcy case would have been brief. Ace Gallery could have substantially repaid its debts. Compare ("Bk. Pet.") at 6 ($17.7 million in petition liabilities) with Bankruptcy R&R ¶ 551 & n.8 ($12,809,192 net unreturned assets).

9

But keeping up with Ace Museum's rent payments bled Ace Gallery dry. Because he embezzled, the bankruptcy case dragged on interminably, forcing a murder of lawyers to spend years -- and more than 4,800 docket entries -- unravelling his mess.[3] See In re Art and Architecture Books of the 21st Century, C.D.Cal. Bk. Case No. 2:13-bk-14135 (docket sheet with 2,766 entries) and related adversary proceedings in Case No. 2:13-ap-01747-RK (220 docket entries); 2:14-ap-01771-RK (139 docket entries); 2:15-ap-01101-RK (6 docket entries); 2:15-ap-01102-RK (32 docket entries); 2:15-ap-01103-RK (74 docket entries); 2:15-ap-01105-RK (62 docket entries); 2:15-ap-01571-RK (17 docket entries); 2:15-ap-01679-RK (1,438 docket entries); 2:15-ap-01680-RK (87 docket entries).

**B.   History and Characteristics of the Defendant**

Defendant's personal history and characteristics present further aggravating factors that justify a significant custodial sentence.

Ever since he was caught, defendant has done his best to avoid responsibility. In the bankruptcy case, upon his appointment, the Plan Agent learned that the "diversion was not an isolated incident but a part of a pattern of false representations to the Bankruptcy Court and steps to hide that conduct from the Court and his own counsel." (ECF 229 at 8 (emphasis added).) Defendant acted in ways to make the investigation into his conduct more difficult. (Id. at 8-

---

[3] "Had Chrismas filed accurate and truthful Monthly Operating Reports, as he was required to do [in the bankruptcy proceedings], he would have been promptly replaced by a Chapter 11 trustee and none of this would have occurred. To avoid that, he deliberately misrepresented virtually every aspect of the Debtor's operations, from reporting fictitious accounts receivable, using estate funds to pay non-estate rents, selling works of art and failing to pay the artists, and failing to disclose his personal expenses being paid by the Debtor, even though he stated, under oath, he was foregoing any compensation from the Debtor." (ECF 229 at 7.)

10

9.) Upon his appointment, the Plan Agent learned that most artists who were owed money by defendant or had works on consignment had not been informed of Ace Gallery's bankruptcy and had not filed a claim prior to plan confirmation. (Ex. 5.) The Plan Agent filed at least eleven stipulations for the artists to permit them pre- and post-petition claims for the amounts owed to them, or for the return of their works. One artist had not been paid for work sold by defendant in 2002. (Id. at 95.)

While he promised to repay what he took (see Shemano Letter), he has given nothing back. (ECF 229 at 119 ("Christmas has not paid anything towards satisfaction of that claims (the $14 million judgment) even though the Judgment against him is nearly three years old.").) Instead, he has refused numerous attempts to get him to sit for a debtor's exam, frustrating his victims' ability to even attempt to collect on their $14 million civil judgment against him. (E.g., ECF 211-1.) He told the Ace Gallery estate in February 2024 that he was "uncollectible" (ECF 144 at 34) and, when the estate asked about his finances in January 2023, in an attempt to collect on its judgment, he refused to give any information. Instead he wrote, "[w]hat you are asking me to do, will cost me time (not a lot of time) . . . Could you please indicate to me why it might be to my advantage to focus time now on the judgment"? (ECF 144 at 32.)

All of this in spite of the fact that, as he has now admitted, defendant has ample resources – enough that the Probation Officer recommended an immediate payment towards restitution. (PSR 81, 83.) Defendant reports a monthly income of at least $30,000, along with his social security payment of $3,400, and spends over $5,000 in rent

11

alone, along with driving a 2020 Range Rover.[4]  (PSR 75.)  As highlighted in trial, defendant does what he wants, when he wants, and paying the litany of creditors before abandoning the lifestyle to which he is accustomed is not to "his advantage." (ECF 144 at 32.)

As the Court is aware from past briefing, defendant received more than $350,000 cash in December 2023, when he sold the Tuna Canyon property.  He kept all of it.  But on top of that, he has now admitted that he has a total monthly income of $38,471 -- a yearly gross of more than $460,000.  In other words, he easily could repay his victims (and he should, seeing as Judge Anderson has already ordered him to do so).  He simply chooses not to, because it would not "be to [his] advantage."  (Id.)

Defendant also has a history of engaging in behavior similar to the counts of conviction.  In the 1980s, he stole between $650,000 and $1,300,000 from an art collector named Charles Frederick Stimpson.  (PSR ¶ 46.)  As detailed in news reports at the time, defendant was "one of the nation's leading dealers of contemporary art" even back then.  (Ex. 4 (LA Times Article, Aug. 7, 1986) at 1.) He used this position of trust to take advantage of Stimpson, stealing seven pieces worth as much as $1.3 million.  (Id.) "Stimpson had left the seven pieces in Chrismas' care over a period of years," and defendant "sold some of the pieces and used others as collateral for loans."  (Id. at 2.)  Defendant ultimately pled guilty

---

[4] The PSR does not indicate the Probation Officer conducted a home inspection.  Defendant lives on the top floor of "a luxury apartment community conveniently located in the Miracle Mile." https://www.lafusionapts.com/ogden/features.html. All of the units are 2-bedroom, 2-bathroom comprising of 1,185 to 1,340 sq. feet. (Id.) Plan Agent Sam Leslie noted to the Court that according to his review, defendant used $174,977.79 of debtor funds funneled through Ace NY to pay defendant's rent. (ECF 229 at 9.)

to felony grand theft. (PSR ¶ 46.) But he repaid the money some 14 years after the plea, and in so doing persuaded the state court to reduce and dismiss the conviction. (PSR ¶ 46; Ex. 4 (the victim "has taken a forgiving attitude . . . and as long as the funds are paid he does not seek a prison sentence").)

Like he did with Stimpson, part of defendant's scheme is to prey upon and abuse victims' patience, their lack of sophistication, and endurance to demand payment. In addition to the multitude of artists he stiffed, defendant cheated collectors who consigned their collections through Ace Gallery, never paying them for art he sold or accounting for missing inventory. (See ECF 228-3 at 6 (Wilson describing missing 7-8 pieces), at 8 (Sears enlisted a lawyer and police detective to assist with payment for "Rockets"), at 17 (Lang, despite being owed as much as one million dollars, "has moved on with his life").

Defendant will likely seek a lower sentence because he is 80 years old. And age can sometimes be a basis for lowered sentences. The Guidelines even contemplate such reductions where "the defendant is elderly and infirm." USSG § 5H1.1. But not here.

Defendant has suffered some physical decline -- some degree of hearing loss, memory loss, and a predisposition to melanoma. (PSR ¶ 67.) But his own self-assessment belies any claim of infirmity: he "reported no serious health issues despite his age." (PSR ¶ 67.) In fact, if anything, his health report militates in favor of a longer sentence: his only mental health concern was reported as "situational depression." (PSR ¶ 68.) A situational depression that comes from the fact that, "the instant offense" has had an "impact on his employment opportunities." (PSR ¶ 68.)

In other words, defendant's most serious medical condition appears to be a troubling case of narcissism and self-pity.  He is sorry that he has difficulty working, but he still ignores the effects his actions have had on other people -- because repaying them would not "be to [his] advantage."  (ECF 144 at 32.) In the Bankruptcy's court's view, defendant's "fraud arose out of his arrogance and disrespect for the legal system."  (ECF 229 at 5.) Lawyers involved in untangling his mess explain, "I do not like him personally, but that is because of what he has done in this Bankruptcy Case."  (Id. at 119.)  Considering the widespread instances of defendant's failing of responsibilities to the creditors and blatant misrepresentations to the Court, "this is simply not an instance where the defendant's age should entitle him to the Court's mercy."  (Id. at 7.)

**C.   Other § 3553(a) Factors**

The discussion above goes hand in glove with the remaining § 3553(a) factors.  No sentence short of a lengthy term of incarceration (18 U.S.C. § 3553(a)(3) would provide adequate punishment, reflect the seriousness of the offense, or promote respect for the law (18 U.S.C. § 3553(a)(2)(A)).  Both general and specific deterrence (18 U.S.C. § 3553(a)(2)(B)) require serious consequences, at peril of future similar frauds (18 U.S.C. § 3553(a)(2)(C)).  The Sentencing Range and policy statements likewise demand a lengthy sentence (18 U.S.C. § 3553(a)(4), (a)(5)).

And giving defendant a break here would cause, rather than avoid, "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(7).

14

Bankruptcy fraud is seldom successfully prosecuted. But embezzlement is common, and attorney embezzlement is akin to the sort of embezzlement defendant committed here, as a trustee for the Ace Gallery bankruptcy estate. Both sorts of crimes defraud the court system itself. And, in attorney embezzlement cases, judges routinely sentence within the Guidelines. For instance, one judge in this district imposed a 144-month sentence where a lawyer stole about $7.5 million from a client and litigation lender. See United States v. Layfield, C.D.Cal. Case No. 2:18-cr-124-MWF, Dkt. No. 452.) And another lawyer who embezzled $12.4 million from his client settlement funds received a 168-month sentence. See United States v. Avenatti, C.D.Cal. Case No. 8:19-cr-61-JVS, Dkt. No. 1054.

For this sort of offense, in other words, a lengthy Guidelines sentence is appropriate.

## VI. FINE & RESTITUTION

Under the Mandatory Victims Restitution Act, restitution is mandatory in this case. As previously described in the Objections to the PSR, defendant originally embezzled more than $15 million from Ace Gallery. But, after accounting for the money he returned, the net Ace Gallery funds that were embezzled but not returned totaled $12,809,192. (Bk. R&R at 88-89, fn.8.) Accordingly, the government requests that the Court order defendant to pay $12,809,192 in restitution – and agrees that the Court should order an immediate payment. (PSR 83.)

Apart from restitution, the Court must impose a $100 special assessment for each count, for a total of $300.

15

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 121 months' prison; (ii) 3 years' supervised release; (iii) restitution of $12,809,192; and (iv) a mandatory special assessment of $300.  This sentence is sufficient, but not greater than necessary to reflect the exceedingly seriousness of defendant's offenses perpetrated upon the creditor-victims and the integrity of the Bankruptcy Court.  This sentence will provide a just punishment for defendant's offenses brazenly undertaken by a thief who gamed a system designed to protect those in financial desperation.  This sentence will promote respect for the law with someone who has none – someone who played with what he needed to disclose to the Court for years, even up until weeks before his own trial. And lastly, this sentence will protect the public from further crimes committed by the defendant upon aspiring artists, collectors, and business owners who provide services to defendant, only to be ripped off or bullied into non-payment or exhausted from attempted collection.  Defendant's crimes were not impulsive or one-off; he engaged in a long running, cynical scheme to enrich himself. Defendant's crimes had severe consequences and a Guideline sentence as recommended should be imposed upon defendant.