JENNIFER L. WILLIAMS (Bar No. 268782)
jenn@summallp.com
MEGAN A. MAITIA (Bar No. 285271)
megan@summallp.com
HAYLEY E. HUNTLEY (Bar No. 351438)
hayley@summallp.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone: (213) 260-9455/52/56
Facsimile: (213) 835-0939

Attorneys for Defendant
DOUGLAS J. CHRISMAS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:21-CR-00127-MCS |
|---|---|
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO GOVERNMENT'S SENTENCING POSITION, PSR OBJECTIONS, AND VICTIM IMPACT STATEMENTS** |
| v. | |
| DOUGLAS J. CHRISMAS, | |
| Defendant. | Sentencing Date: January 13, 2025<br>Time: 10:30 a.m.<br>Courtroom: 7C |

Defendant, Douglas J. Chrismas, by and through his counsel of record, hereby submits his Objections to the Government's Sentencing Position, the Government's PSR Objections, and Victim Impact Statements.

| | |
|---|---|
| | Respectfully submitted, |
| Dated: January 6, 2025 | /s/ Megan A. Maitia |
| | MEGAN A. MAITIA |
| | JENNIFER L. WILLIAMS |
| | HAYLEY E. HUNTLEY |
| | |
| | Attorneys for Defendant |
| | DOUGLAS J. CHRISMAS |

## MEMORANDUM OF POINTS AND AUTHORITIES

The Government has submitted a sentencing position based on false and misleading information (Dkt. 231), lodged improper objections to the PSR (Dkt. 228), and submitted improper victim impact statements (Dkt. 229). In response, Defendant Douglas Chrismas makes the following objections:

**1.  Mr. Chrismas did not "steal" $12.8 million.**

The Government falsely claims that Mr. Chrismas "stole" $12.8 million and "has never shown any remorse." (Dkt. 231 at ECF header 4.) This is false. Mr. Chrismas caused $12.8 million worth of transfers without bankruptcy court permission. Virtually all this money went to pay ACE Gallery's debtor obligations, was transferred back to the Gallery, or otherwise was spent for the benefit of the Gallery, including through ACE Museum's rental payments. (*See* Dkt. 232 at ECF header 9-11, Defendant's PSR Objections regarding Ziegler expert report and multi-million-dollar loss amounts.)

**2.  The Government's loss amount is based on the unsound expert report of Jennifer Ziegler.**

The Government's reliance on the expert report of Jennifer Ziegler (Dkt. 231 at 5) is misleading because Ziegler explicitly added up the amount of funds transferred without bankruptcy court permission and *did not consider* whether those funds benefitted the Gallery or were transferred in the ordinary course of the Gallery's business. (*See* Dkt. 232 at 9-11, Defendant's PSR Objections regarding Ziegler expert report and multi-million-dollar loss amounts.)

**3.  The Government has not met its evidentiary burden to show Mr. Chrismas' charged conduct caused ACE Gallery to liquidate.**

The Government argues the transfers caused ACE Gallery to liquidate and go out of business. (Dkt. 231 at 9.) The Government offers no evidence that Mr. Christmas' conduct was the proximate cause of the estate's liquidation. *See United States v. George*, 949 F.3d 1181, 1187-88 (9th Cir. 2020) (under section 2B1.1(b)(2), it is the Government's burden to establish but-for and proximate cause.)

The Government then argues that, had Mr. Chrismas not embezzled, "the bankruptcy case would have been brief" because "Ace Gallery could have substantially repaid its debts." (Dkt. 231 at 12.) The Government knows this argument is false and misleading. The money was not pocketed by Mr. Chrismas but routed through ACE New York to pay Gallery obligations (including artists and other creditors) and otherwise support the Gallery. What Mr. Chrismas understands now, but did not know back then, is that the nature of Chapter 11 bankruptcy proceedings virtually always precludes any result *other than* liquidation. This is because, in reality, bankruptcy lawyers and court-appointed trustees (each incentivized to churn the bill) always get paid first. Not even debtors who are successful enough to bring in large sums of money, like Mr. Chrismas, are guaranteed to end the bankruptcy. Chrismas brought in *$20 million,* earned from the 2015 Beverly Hills purchase option and sale, and the bankruptcy did not end, because so much of the money was eaten up by lawyers. (*See* Dkt. 232 at 13; *see also* Dkt. 229 at ECF p. 186, "Professional Fees Chart," showing a total of $7,349,910.51 in professional fees incurred in connection with ACE Gallery Bankruptcy case.)

**4.   The $14 million civil judgment, and Mr. Chrismas' failure to pay that judgment in full, is irrelevant.**

The Government repeatedly states Mr. Chrismas refused to sit for a civil debtor's exam (Dkt. 231 at 14) as though that (unsupported) fact would justify a 10-year prison sentence. But Sam Leslie and his Plan Agent *never even sought* a debtor's exam until *after* Mr. Chrismas' May 2024 criminal trial. At that point, the Government claimed to be investigating Mr. Chrismas' December 2023 sale of the Tuna Canyon property, so Mr. Chrismas—on the advice of counsel—invoked his Fifth Amendment Right and did not sit

for the exam. (*See* Dkt. 217 at 10 n.5.) The Government's adverse use of that invocation at sentencing is unconstitutional.[1]

**5.    The Government disregards Mr. Chrismas' actual payments to creditors, including payments he made on behalf of the Gallery estate.**

The Government argues that Mr. Chrismas has paid "a grand total of $0." (Dkt. 231 at 4.) But Mr. Chrismas, after being shut out of his Gallery by Sam Leslie, *personally* paid a total of $58,500 to artist David Amico between September 2019 and June 2022. This was money owed by the Gallery *estate* to Mr. Amico, but Mr. Chrismas paid it. Again in 2018, Mr. Chrismas represented artist Helen Pashgian and generated $700,000 in sales for her, satisfying the $422,187.50 owed to Ms. Pashgian by the Gallery estate. *See* **Exhibits B-C** (Amico and Pashgian Ledgers).

Mr. Chrismas also entered settlement agreements for the benefit of the estate wherein he personally paid money (and other consideration) to, or on behalf of, the Gallery estate: one with Sam Leslie and another with Eric Wilson. Under the Leslie settlement agreement, in May 2022, Mr. Chrismas paid $100,000 cash to the Gallery estate and released all claims in connection with an artwork that was gifted to Mr. Chrismas by artist Park Seo-Boo; this allowed Leslie to sell the Seo-Bo artwork free and clear, netting the Gallery approximately $300,000. Under the second settlement, Sam Leslie negotiated a settlement with creditor Eric Wilson that gave Wilson rights (among other things) to the "re-purchase option" over the Beverly Hills property which had been sold to the MTA and which had netted the Gallery $20 million. Mr. Wilson—in bed with Leslie in their campaign against Mr. Chrismas to ensure his financial failure—had no ability to monetize this re-purchase option himself. He entered into an agreement with Mr. Chrismas where *Mr. Chrismas* paid the MTA $350,000 cash on behalf of Mr. Wilson to keep the re-purchase option alive. *See*

---

[1] Highlighting the Government's failure to conduct any investigation in this case is the fact that Mr. Chrismas *did* sit for a debtor's exam on August 25, 2022 in connection with the judgment obtained by 400 S. La Brea—a fact which has never been surfaced by the Government. *See* **Exhibit A**, Case No. BC626437.

**Exhibit D** (Bank statement showing May 24, 2022 transfer to Law Offices of Carolyn Dye, May 27, 2022 check of $350,000 to MTA and copy of check to MTA), **Exhibit E** (Chrismas-Leslie Settlement Agreement), and **Exhibit F** (Chrismas-Wilson Settlement Agreement).

Later in 2022, Mr. Chrismas labored to bring about a $2 million sale of an artwork owned by Eric Wilson (Robert Irwin Prism) through which no commission would be paid to Mr. Chrismas. *See* **Exhibit G**.[2]

Each of these examples documenting Mr. Chrismas' personal contributions to the creditors and to the estate contradict the Government's claim that Mr. Chrismas has paid "a grand total of $0." (Dkt. 231 at 4.) What's more, each of these examples is known to Sam Leslie, the Government's main source of information in this case. Either the Government also knows of them and did not disclose them to the Court, or it did nothing to discover them.

**6.   $12.8 million is not a proper restitution amount.**

The Government's $12.8 million restitution argument is unsupported. Under 18 U.S.C. § 3663A(a)(2), restitution is limited to the counts of conviction where a defendant is found guilty of a crime that does not require proof of a scheme, conspiracy, or pattern of criminal activity. *United States v. Booth*, 309 F.3d 566, 575–76 (9th Cir. 2002) (a restitution order may be based on related but uncharged conduct only if it is part of a charged fraud scheme); *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir. 2003).

---

[2] The Government identifies Eric Wilson as a victim and includes a November 2020 letter from Eric Wilson to the U.S. Attorney's Office, pushing for the Government to pursue a criminal prosecution against Mr. Chrismas. (Dkt. 228-3 at 5-7.) Mr. Wilson reaped valuable financial benefits through his coordinated effort with Sam Leslie to "rid" Mr. Chrismas of his own Gallery. This coordination is evidenced by, among other things, Leslie looking the other way when Mr. Wilson owed—but refused to pay—millions of dollars in sales tax for Gallery artwork purchases, and Leslie agreeing to Mr. Wilson's claim against the estate for money which had clearly been loaned for the benefit of the estate (to ACE Gallery New York and ACE Museum). *See* **Exhibit H**.

Here, none of the three counts against Mr. Chrismas required proof of a scheme, conspiracy, or pattern of criminal activity. At most, the Court could order that Mr. Chrismas pay restitution in the amount charged in the Indictment, $264,595. Even then, the Court must consider recoupment – which the government should be required to disclose – from settlements, from the benefits and other value the Museum provided to the Gallery operations and creditors, from the Gallery expenses paid by ACE New York, and from Mr. Chrismas' injection of millions of dollars into the estate after the sale of the Beverly Hills property. (*See* Dkt. 232 at ECF header 9.)

**7.    The Government misrepresents Mr. Chrismas' income and "lifestyle."**

The Government misrepresents Mr. Chrismas' income and lifestyle, falsely claiming he has an annual income of $460,000, he could "easily repay" victims but "simply chooses not to," and claiming he refuses to pay his civil judgments because he doesn't want to abandon "the lifestyle to which he is accustomed." (Dkt. 231 at ECF header 14-15, citing PSR ¶¶ 72, 75.) None of these inflammatory arguments is supported by credible evidence.

Mr. Chrismas has lived in the same apartment building since 2017, most of which is a dedicated office space. It sits in a three-story, 12-unit apartment building with no luxury amenities and no adjacent luxury rental buildings. The building's small lobby measures a mere 64 inches by 79 inches. Given Mr. Chrismas' dismal financial situation and credit score, it would be nearly impossible for him to relocate.

Mr. Chrismas bought his current 2020 Range Rover four years ago, at 76 years old, after Sam Leslie seized his Jeep (which Mr. Chrismas had driven for 20 years) and another older truck (which Mr. Chrismas had had for five years). Left without a car—and transportation to continue working—Mr. Chrismas financed the Range Rover, but, as his recent monthly financial reports show, has had difficulty staying current on the loan. In addition to the loan from the lender, the vehicle is also encumbered with a UCC-1 perfected lien.

As for income, the PSR reports an average monthly business revenue of $30,000. This is not "income"; it is *gross earnings before expenses*.[3] Mr. Chrismas is a self-employed art dealer/broker. He has no guaranteed business income, and it is typical for him to make no sales and have no business revenue in any given month.

In Mr. Chrismas' November 2024 monthly report to the USPO, Mr. Chrismas indeed reported $38,000 in business revenue, which reflected commission for the brokered sale of an artwork that Mr. Chrismas marketed *for over 18 months* before finally finding a buyer. To repeat, this is $38,000 in revenue (not income) earned over a year and a half. This commission was hard earned and unique, as is any given month in a business like his, and the revenue (not including taxes) went almost entirely to pay business payroll and living expenses, pay back previous loans used to cover living expenses, and pay down credit cards used to cover living expenses. In his October and December 2024 monthly reporting, Mr. Chrismas reported *zero dollars* in business revenue; his only income was $3,471 in monthly social security payments, which covered less than half of his business and living expenses for those months.[4] Mr. Chrismas' forthcoming January 2024 monthly reporting will similarly show zero business revenue and more debt, as he borrowed money to cover payroll and his living expenses.

*This* is Mr. Chrismas' "lifestyle."

And again, the Government has access to all this information. Mr. Chrismas makes detailed financial reports every month to his Pretrial Services Officer; these reports were available to the officer (in the same office) who prepared the PSR; and they were available to the Government, if it had wanted to know the facts.

---

[3] To the extent the PSR expresses anything but an average gross monthly revenue, the defense objects to paragraphs 72 and 75 of the PSR as inaccurate.

[4] Defense counsel has reviewed copies of Mr. Chrismas' three most recent monthly financial reports and can lodge them *in camera* upon the Court request.

**8.      The Tuna Canyon property sale is a red herring.**

The Government repeats its unsupported talking points about Mr. Chrismas' 2023 sale of the Tuna Canyon property, that the property and sale proceeds either belonged to the estate or should have been voluntarily turned over to the estate to satisfy a civil judgment. (Dkt. 231 at 15.) Part and parcel with the misconduct detailed in the defense's pending post-trial motion, the Government continues to peddle false and misleading information to the Court about the Tuna Canyon property and its relevance to the bankruptcy litigation and this criminal case. (*See* Defendant's arguments at Dkt. 212 at pp 12-15, citing Dkt. 122 and 159.)

**9.      The Government has not met its burden to show there are 10 or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(i).**

The Government seeks a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) (ten or more victims), arguing that in bankruptcy fraud cases, the victim "encompasses both the trustee and (at least) everyone listed on the bankruptcy schedules." (*See* Dkt. 228 at 3, Dkt. 231 at 8-10.)

The Government cites *United States v. Klassy*, 409 F. App'x 169, 172 (9th Cir. 2011) to support this position. But *Klassy* provides that the trustee may be considered a victim to the extent the fraud "deprives the estate of assets otherwise subject to administration." *Id.* Here, the Government has not established by a preponderance of evidence that the Museum rent payments (or any funds routed through ACE New York) were outside the ordinary course of business, especially given the financial benefits the Museum conferred on the Gallery, so the Government has not shown these assets were "subject to administration." *Id.* And *Klassy* provides that the estate's unsecured creditors may be counted as victims if they "sustained a loss that is 'monetary or that otherwise is readily measurable in money' and that loss must be included in the loss calculation." *Id.*, citing *United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008); *see also* U.S.S.G. § 2B1.1, cmt. n. 1 (defining victim as any person who sustained actual loss in the form of reasonably foreseeable pecuniary harm). In other words, *there,* unsecured creditors were "victims" only because there was

7

OBJECTIONS TO GVT'S SENTENCING POSITION, PSR OBJECTIONS, AND VICTIM IMPACT STATEMENTS

sufficient evidence that "each of the unsecured creditors would have received something if not for *Klassy's* fraud." *Id.*

Here, the Government does not meet its burden. Its evidence is a compilation of FBI 302 interview memos and emails, each with multiple levels of hearsay and each insufficient to support a finding that these purported creditors would have been paid the money but for Mr. Chrismas' transfers. (*See* Dkt. 228-3.) For example, the Government submits:

- FBI 302 memorandum reflecting an October 7, 2023 interview of Justin Bower, who purportedly said that an unnamed person associated with the bankruptcy case contacted him and said "that it looked like Chrismas contractually owed Bower $200,000." Bower reported submitting unidentified paperwork in the bankruptcy case, but "nothing ever came of it." (*Id.* at pp. 1-2.)

- FBI 302 memorandum reflecting an October 10, 2023 interview of Laurie Lipton, who testified that she received "large reams of documents" from the bankruptcy "but could not afford to hire a lawyer so she simply set the documents aside." (*Id.* at 3-4.)

- FBI 302 memorandum reflecting an October 12, 2023 interview of Bob Sears, who engaged Mr. Chrismas to sell an artwork. Though Mr. Chrismas appears to have communicated poorly throughout the process, Mr. Sears received a $100,000 check for the sale of the artwork when he originally thought (before he hired Mr. Chrismas) that the painting would sell for only $20,000. (*Id.* at 8-9.)

- FBI 302 memorandum reflecting an October 11, 2023 interview of Melanie Pullen, who said she believed Mr. Chrismas underpaid her for the sale of her artwork, but she provides no details about what artwork was sold, when it was sold, or any details about why she believes she was underpaid. In a follow-up email dated October 12, 2023, Ms. Pullen declined to discuss the issues further given a confidentiality provision in a settlement agreement she had with the Gallery estate. (*Id.* at 10-13.)

- FBI 302 memorandum reflecting a May 23, 2023 interview of Mary Corse, who had a contract with the Gallery that paid her monthly, but she stopped her relationship with the gallery "five or six years ago" because "Chrismas stopped paying people." Of course, six years prior to May 2023 was when Sam Leslie took over the Gallery and oversaw any paying (or not paying) of people. (*Id.* at 14-15.)
- FBI 302 memorandum reflecting an October 23, 2023 interview of Armando Lerma, who also reports a contract with the Gallery that paid him (and another artist, Carlos Ramirez) monthly. Lerma reported they were unpaid by Chrismas for artwork sold, but he doesn't provide any details. (*Id.* at 16.)
- December 15, 2024 email from a representative of Gary Lang, who states a belief (with no other details) that Mr. Lang has a claim against the Gallery "as much as $1,000,000.00," Mr. Lang declined to consent to an interview because "[h]e has moved on with his life." (*Id.* at 17.)

There is no sign that any of these individuals consider themselves victims or *are even aware* the Government is using their statements to support its outrageous sentencing position.

These statements certainly do not establish by a preponderance of evidence that any pecuniary harm was directly and proximately caused by Mr. Chrismas' conduct.

**10.     The 1986 criminal case was dismissed and should not be relied on.**

The Government claims Mr. Chrismas has a "history of engaging in behavior similar to the counts of conviction," referencing a 40-year-old criminal case *that was dismissed*. The Government has never sought to contact the purported victim Charles Frederick Stimpson. If it had, it would have learned that Charles Stimpson used funds from the Stimpson family trust to pay for artworks without the approval of other trust beneficiaries, and then his family members ginned up criminal charges against Mr. Chrismas. Mr. Stimpson worked to correct the false accusations against Mr. Chrismas, resulting in the

dismissal of the criminal charges. Mr. Chrismas continues to represent the Stimpson family to this day. (*See* **Exhibit I**.)

**11.    The Government improperly solicited—and Judge Kwan improperly submitted—a victim impact statement.**

The Government solicited and filed a "Victim Impact Statement" from United States Bankruptcy Judge Robert Kwan, who submitted it on "behalf of the United States Bankruptcy Court." (Dkt. 229 at 2.) The defense objects to the submission for three reasons: *first,* the Bankruptcy Court is not a victim in this case. *Second,* the bankruptcy judge cites the Bankruptcy Court's Report and Recommendation (and the Government also relies on this recommendation in claiming a $14 million loss), even though Mr. Chrismas invoked his Fifth Amendment privilege against self-incrimination in that proceeding, and to draw an adverse inference from that invocation at Mr. Chrismas' criminal sentencing violates his Constitutional right. And *third,* the letter violates the Code of Conduct for United States Judges. Code of Conduct for United States Judges (United States Courts), https://legalethicstexas.com/resources/rules/code-of-conduct-for-united-states-judges/a-judge-should-uphold-the-integrity-and-independence-of-the-judiciary/ (last visited Jan 03, 2025).

*The bankruptcy court is not a victim in this case.* The Crime Victims' Rights Act, codified in 18 U.S.C.A. § 3771, confers a right on "crime victims" to be "reasonably heard" at a public sentencing. U.S.C. § 3771(a)(4). But sovereigns are not "victims" under the CVRA. *See United States v. Kasper*, 60 F. Supp. 3d 1177, 1178 (D.N.M. 2014) (upholding "presumption that 'person' excludes sovereigns" under the CVRA). This means the bankruptcy court is not a victim (here, or anywhere, ever), and neither is the more abstract "integrity of the bankruptcy system," as Judge Kwan suggests. (Dkt. 229 at 1, 5.) Despite this, the Government "advised" Judge Kwan the bankruptcy court was "considered a victim…for purposes of the Crime Victims' Rights Act" and enlisted the court to submit a statement. (*See* Dkt. 229 at 2.) While the Court may not be barred from considering the

statement,[5] the Government has misled Judge Kwan into wrongfully invoking a right the bankruptcy court does not enjoy under the CVRA, and the Government misleads this Court by sticking the label "Victim Impact Statements" where it does not belong.

***To consider Judge Kwan's statement is to draw an improper adverse inference against Mr. Chrismas for asserting his Fifth Amendment right in the bankruptcy proceeding before Judge Kwan***. The Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Invocation of the Fifth Amendment in a civil case is not admissible in a subsequent criminal prosecution. *See E.C. v. K2 Unlimited, Inc.*, 15 F. Supp. 3d 158, 161 (D. Mass. 2014) (citing *Mottram v. Murch*, 458 F.2d 626, 630–31 (1st Cir.), rev'd on other grounds, 409 U.S. 41 (1972) ("It is elementary that a defendant may not be impeached by showing that he had previously taken the Fifth Amendment when asked similar questions. The possibility of prejudice is too great to justify even such limited use."); *see also* 8 Wright, Miller & Marcus, Federal Practice & Procedure § 2018 at 460 (3d ed. 2010) ("Even if there should subsequently be a criminal prosecution, the jury in that action would be unaware of the earlier claim of privilege and of any inference from it."). To increase Mr. Chrismas' sentence based on a purported "loss" amount calculated at a bankruptcy proceeding, amplified here through the megaphone of a judge who presided over that proceeding, where Mr. Chrismas did not testify, would be to penalize him for exercising his Fifth Amendment right.

***Judge Kwan's statement violates the judicial code of conduct.*** Federal judges are governed by a Code of Conduct, which includes critical ethical canons. For example:

---

[5] *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Federal judges have a duty to avoid impropriety and the appearance of impropriety in all activities. *Id.,* Canon 2. A judge should not "lend the prestige of the judicial office to advance the private interests of the judge or others." *Id.*, 2B. The second Canon directs that, a "**judge should not testify voluntarily as a character witness**." *Id.* This includes "discourag[ing] a party from requiring the judge to testify as a character witness..." *Id.,* Commentary. And according to the Commentary, a "**judge should not initiate communications to a sentencing judge** or a probation or corrections officer but may provide information to such persons in response to a formal request." *Id.* These directives could not be clearer. And yet, Judge Kwan flouts them, voluntarily positioning himself as a witness by using words like "bad faith," "arrogance," and "disrespect" in his statement (Dkt. 229 at 4, 5); initiating communications to a sentencing judge (*Id.* at 1, ("Dear Judge Scarsi…")); and pushing for an "appropriate sentence" (*Id.* at 5). Judge Kwan's letter reads like a government brief, caselaw citations and all, and establishes that—though he may have been tasked with being a neutral arbiter in the bankruptcy case—he has joined sides in this criminal process. The statement is improper, and the Court should refuse to consider it to eliminate any possible perception that is an "official testimonial." *See* Code of Conduct for United States Judges, Canon 2B, Commentary ("Testimony as a character witness injects the prestige of the judicial office into the proceeding in which the judge testifies and may be perceived as an official testimonial.").

Federal judges also have a duty to perform the duties of the office impartially. This means that, among other things, a "**judge should not make public comment on the merits of a matter pending or impending in any court**." *Id.,* Canon 3(A)(6). This admonition continues until the appellate process is complete. *Id.,* Commentary. Here, Judge Kwan's comment in a public filing on a pending matter goes straight to the merits and puts a thumb on the scale on the scale of the outcome.

* * *

Judge Kwan's submission of the statement is also evidence of Government misconduct and should be excluded from review for that reason alone: it was error for the

Government to solicit the statement and invite Judge Kwan to overstep; it was error to file it as a "Victim Impact Statement" when it is not one; and it is error for the Government to submit such an influential letter when it does little more than repeat facts already in the public record, leading to an a reasonable inference that the Government's only motivation is to improperly influence the Court. The Government's misconduct in this case, already well-documented, continues, and the defense requests the Court consider these new errors with the pending post-trial motions to dismiss for prosecutorial misconduct and for a new trial.

**12.     The Government's examples of "similar" cases prove the opposite.**

The Government makes a half-hearted suggestion that a121-month sentence avoids "unwarranted disparities" under 18 U.S.C. § 3553(a)(7) without any meaningful comparison. (Dkt. 231 at 18.) It says "[b]ankruptcy fraud is seldom successfully prosecuted" (*Id.*), but again, the Government did not prosecute Mr. Chrismas for bankruptcy fraud. More accurately, it charged him with embezzlement of a bankruptcy state under a statute, 18 U.S.C. 153, that has been used only *once* in the last ten years—in this case. (Dkt. 233 at 19.) Having first singled out Mr. Chrismas for prosecution under this rarified statute, the Government now compares him to a different category of offenders— headline-grabbing attorney embezzlers—in a perfunctory paragraph. (Dkt. 231 at 18.) The comparison fails.

Categorically speaking, attorney embezzlement is nothing like embezzlement by a debtor-in-possession of a bankruptcy estate. Attorneys are in a unique position of trust and are more culpable when they violate that trust. They undergo four years of undergraduate and three years of post-graduate education; they sit for a rigorous licensure exam; they conform to state regulations, including continuing education requirements, to keep licenses active; they are governed by a code of ethics and subject to myriad consequences for violations of that code, including court discipline, state bar discipline, and malpractice actions. And except in some cases, attorneys are not appointed; they are hired.

Mr. Chrismas was a self-taught art gallerist with no education, training, or certification in running an estate or even a business. No one confused him for an experte. In fact, it was Mr. Chrismas' mismanagement of the gallery business that contributed to its bankruptcy in the first place, which ironically means his record of poor management was what led him to become trustee. And though the system elevated him to a position of trust, he was a novice, and the creditors no more trusted him than they would anyone else in that role.

The comparisons unravel further upon closer look at the Government's example cases:

In *United States v. Avenatti*, C.D.Cal. Case No. 8:19-cr-61-JVS, the defendant was a plaintiff's lawyer who was convicted "for stealing millions of dollars from his clients – one of whom was a paraplegic with mental health issues – and for obstructing the IRS's efforts to collect more than $3 million in payroll taxes from an Avenatti-owned coffee business." *See* United States Attorney's Office, *Lawyer Michael Avenatti Sentenced to 14 Years in Federal Prison for Stealing Millions of Dollars from Clients and Tax Fraud,* https://www.justice.gov/usao-cdca/pr/lawyer-michael-avenatti-sentenced-14-years-federal-prison-stealing-millions-dollars (last visited Jan. 3, 2025). The 9th Circuit recently vacated Mr. Avenatti's 14-year sentence for errors in the loss and Guidelines calculations, so any utility in comparing is diminished. *See* United States v. Avenatti, Ninth Cir. Case No. 22-50301 (Memorandum issued Oct. 23, 2024). Still, according to the Government's press release, his conduct is distinguishable from that of Mr. Chrismas: "He stole millions of dollars from his clients – all to finance his extravagant lifestyle that included a private jet and race cars"; would "lie" about the terms of personal injury settlements, "conceal" the payments, and "secretly take and spend" them; and would "lull the client into not complaining or investigating further by providing small 'advances' on the supposedly yet-to-be paid funds."

In *United States v. Layfield*, C.D.Cal. Case No. 2:18-cr-124-MWF, the defendant was a plaintiff's lawyer, *plus,* a certified public accountant. *See* United States Attorney's

Office, *Disbarred Lawyer Sentenced to 12 Years in Prison for Stealing Injured Clients' Settlement Money and Cheating on Federal Income Taxes,* https://www.justice.gov/usao-cdca/pr/disbarred-lawyer-sentenced-12-years-prison-stealing-injured-clients-settlement-money (last visited Jan. 3, 2025). He operated his business like a Ponzi scheme, moving money from one client trust account to pay another. *See id.* He used misbegotten money to fund his expensive life: moving abroad, "buying a horse and shipping horses to Costa Rica." *Id.* He stole settlement money from clients suffering from "significant injuries," who, as the government there argued, "had hired [Layfield] to bring them closure and some sense of relief." *Id.*

*Avenatti* and *Layfield* are only useful as examples of outcomes the Court should avoid. (*See* Dkt. 233 at 19; *see also United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (it is a legitimate goal of sentencing to avoid "unwarranted *similarities* among [defendants] who were not similarly situated.") (*quoting Gall v. United States*, 552 U.S. 38, 55 (2007) (emphasis in original)). Mr. Chrismas was not a licensed professional who used expertise, or the appearance of legitimacy, to get people to hire him; he did not steal money owed to vulnerable people without a view into what he was doing; he did not elaborately conceal his efforts; and he did not spend money on himself.

Rather, at the risk of repeating what the Court has read many times, Mr. Chrismas was an art gallerist thrust into the role of bankruptcy trustee in a stressful and adversarial bankruptcy process; he openly recorded the transfers at issue on company books; and he spent money for the benefit of the estate. He is nothing like the Government's examples and should not be sentenced like them, either.

**13.    Request for an evidentiary hearing.**

Should the Court consider any of this objectionable evidence in making factual findings about loss, restitution, or otherwise imposing a sentence, Mr. Chrismas requests an evidentiary hearing to cross-examine the Government's purported evidence.

| | |
|---|---|
| Dated: January 6, 2025 | Respectfully submitted,<br>Summa LLP<br><br> /s/ *Megan A. Maitia*<br>Megan A. Maitia<br>Jennifer L. Williams<br>Hayley E. Huntley<br><br>Attorneys for Defendant<br>DOUGLAS J. CHRISMAS |