JENNIFER L. WILLIAMS (Bar No. 268782)
Email: jenn@summallp.com
MEGAN A. MAITIA (Bar No. 285271)
Email: megan@summallp.com
HAYLEY E. HUNTLEY (Bar No. 351438)
Email: hayley@summallp.com
SUMMA LLP
1010 Sycamore Avenue, Unit 117
South Pasadena, California 91030
Telephone:  (213) 260-9456
Facsimile:  (213) 835-0939

Attorney for Defendant
DOUGLAS J. CHRISMAS

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-CR-00127-MCS |
| Plaintiff, | |
| v. | **DEFENDANT DOUGLAS J. CHRISMAS' *EX PARTE* APPLICATION FOR AN ORDER FOR BOND PENDING APPEAL; MEMORANDUM OF POINTS AND AUTHORITIES** |
| DOUGLAS J. CHRISMAS, | |
| Defendant. | **[Filed concurrently with Declaration of Counsel and [Proposed] Order]** |

Defendant Douglas J. Chrismas, by and through his counsel of record, Jennifer L. Williams and Megan A. Maitia, applies *ex parte* for an order for bond pending appeal.

This application is based on the attached Memorandum of Points and Authorities and declaration of counsel, the files and records in this case, and any other evidence or argument presented at the hearing on this motion.

Defense counsel has conferred with counsel for the government. On January 21, 2025, the defense emailed the government to seek its position on bond pending appeal and this *ex parte* application (so that the request to be heard on shortened time). The government responded and confirmed its opposition to both requests. The defense then asked whether the government would stipulate to a request that the Court extend the self-surrender date to accommodate a regularly noticed motion schedule (versus this *ex parte* filing), and the government declined. *See* concurrently filed Declaration of Jennifer L. Williams ¶¶ 4-5.

Accordingly, to allow enough time between the Court's ruling on this request (and any appeal to the Ninth Circuit appeal on the bond issue), and to ensure Mr. Chrismas is not irreparably harmed by having to surrender to custody while this bond issue is outstanding, the defense respectfully requests (1) that if the Court requires a hearing on this matter, that any hearing be set on or before February 7, 2025; *or alternatively*, that the Court continue Mr. Chrismas' self-surrender date to on or after March 10, 2025.

Respectfully submitted,

Dated: January 22, 2025          */s/ Jennifer L. Williams*

Jennifer L. Williams
Megan A. Maitia
Hayley E. Huntley
Attorneys for Douglas J. Chrismas

DEFENDANT'S *EX PARTE* APPLICATION FOR AN ORDER FOR BOND PENDING APPEAL

# TABLE OF CONTENTS

## Contents

I.      INTRODUCTION ............................................. 1

II.     LEGAL STANDARD FOR BOND PENDING APPEAL ........................... 2

III.    ARGUMENT................................................... 4

        A…....Mr. Chrismas is not a flight risk or a danger to the community...........4

        B……Mr. Chrismas' appeal is not a delay tactic and will raise substantial questions that, if decided in his favor, would result in reversal or a new trial......5

        1.      Jury Instructions and Constructive Amendment.......................5

        2.      Improper and Unnoticed Expert Testimony...............................8

        3.      Incorrect Guideline Calculation .................................................10

IV.     CONCLUSION.................................................. 12

# TABLE OF AUTHORITIES

**Cases**

*Bank of China, N.Y. Branch v. NBM LLC (Bank of China)*, 359 F.3d 171 (2d Cir. 2004) .... 9

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) ................................................... 8

*United States v. Avenatti*, Ninth Cir. Case No. 22-50301 ................................................ 11

*United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020) ....................................................... 8

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003) ................................................ 2, 3

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985) ................................................. 2, 3

*United States v. Hartz*, 458 F.3d 1011 (9th Cir. 2006) ...................................................... 8

*United States v. Munguia*, 704 F.3d 596 (9th Cir. 2012) ............................................... 5, 7

*United States v. Prezioso*, Ninth Circuit Case No. 18-50056 ......................................... 2, 3

*United States v. Sarkissian*, 755 F. App'x 613 (9th Cir. 2018) .......................................... 9

*United States v. Vega*, 813 F.3d 386 (1st Cir. 2016) .......................................................... 9

*United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014) ...................................................... 10

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ......................................................... 8

*United States v. White*, 492 F.3d 380 (6th Cir. 2007) ......................................................... 9

*United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015) .................................................. 9

**Statutes**

18 U.S.C. § 153 ........................................................................................................... 1, 5, 6

18 U.S.C. § 3143(a) ............................................................................................................ 4

18 U.S.C. § 3143(b) ............................................................................................................ 2

18 U.S.C. § 3143(b)(1) ..................................................................................................... 12

18 U.S.C. § 3143(b)(1)(B)(iii) ......................................................................................... 12

18 U.S.C.A. § 3143(b) ........................................................................................................ 2

USSG § 2B1.1(b)(1) ...................................................................................................... 10, 11

**Other Authorities**

Fed. R. Evid. 701 ................................................................................................................ 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Douglas Chrismas merits bail pending appeal.

Mr. Chrismas was convicted at trial of three counts of bankruptcy embezzlement under 18 U.S.C. § 153, which says a trustee "who knowingly and fraudulently appropriates to the person's own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor" is guilty.

The central issue in this case is, and always has been, a legal issue at the heart of the only crime charged: Does 18 U.S.C. § 153 require the government to prove only that a defendant transferred money from the bankruptcy estate without court permission? (If this is the case, then it is no defense that the defendant made the transfers intending to benefit the estate and not for his "own use." Transfer plus lack of court approval is enough for a conviction.) This was the government's trial theory.[1]

Or does the phrase "to the person's own use" modify every verb in the statute? Does the statute require the government to prove the defendant intended to transfer the funds for his own use as an essential element of the charge? (If this is the case, then the defendant may put forth a defense that he made the transfers to benefit the bankruptcy estate and not for his "own use.") This has always been Mr. Chrismas' theory.

This Court ultimately sided with the government's interpretation, allowing the prosecutors to proceed on a "guilty by transfer without court permission" theory and precluding Mr. Chrismas from arguing "that he evades liability under the statute on the basis that he did not transfer…funds from the bankruptcy estate for, or to, his own use." (Dkt No. 153.) Thus, the defense that Mr. Chrismas made the transfers for the benefit of the estate, and not for his own use, was "not legally available to him." (*Id.*)

---

[1] This was not the government's charging theory or its theory leading up to trial, as the defense has argued in its post-trial motions concerning constructive amendment and government misconduct. (*See* Dkt. No. 194, Defense's Consolidated Post-Trial Motions.)

---

Mr. Chrismas intends to appeal this substantial issue (along two others set forth below.)[2] This central issue is not frivolous or new, and his raising it is not for purposes of delay. Indeed, as the Court recently observed, the parties "substantially litigated [this issue] both leading up to and during trial." (Dkt. No. 238.) And, the government acknowledged at sentencing, "throughout this proceeding, we've had very little caselaw to go off of under 18 U.S.C. § 153." (Jan. 13, 2025 audio from sentencing hearing at 28:45.) Moreover, Mr. Chrismas is neither a flight risk nor a danger to the community. This Court, in permitting self-surrender (and rejecting the government's motion for immediate remand) already found Mr. Chrismas to be amenable to supervision under the current bond conditions.

The issues set forth below raise substantial questions of law that, if successful, are likely to result in reversal, a new trial, a sentence that does not include imprisonment, or a reduced sentence less than the expected duration of an appeal. Given these issues and because Mr. Chrismas poses neither a flight risk nor danger, he is statutorily entitled continued bond pending appeal.

## II.    LEGAL STANDARD FOR BOND PENDING APPEAL

Under 18 U.S.C.A. § 3143(b), the Court *shall* release a defendant pending appeal if the Court finds (a) by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community, and (b) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include imprisonment, or a reduced sentence to a term less than any time already served plus the expected duration of the appeal process. 18 U.S.C. § 3143(b) (emphasis included); *see also generally United States v. Handy*, 761 F.2d 1279, 1280-84 (9th Cir. 1985); *United States v. Garcia*, 340 F.3d 1013 1015 (9th Cir. 2003); *United States v. Prezioso*, Ninth Circuit Case No. 18-50056,

---

[2] Mr. Chrismas may pursue other issues on appeal but sets forth the "substantial" ones here.

Dkt. No. 34 (reversing district court order denying bond pending appeal under this standard in Case No. 2:16-cr-00712-JFW-1 (2018)).

The "substantial question" standard under § 3143(b) involves two questions that are easily confused. *See Prezioso, supra*. A "substantial question" means one that is "fairly debatable." *Handy*, 761 F.2d at 1283. "Fairly debatable" questions include not only novel questions but also questions that are "not readily answerable." *Id*. at 1281. Moreover, "[t]he application of well-settled principles to the facts of the instant case may raise issues that are fairly debatable." *Id*. Thus, Mr. Chrimsas does not have to show that reversal is more likely than not. *Id*. at 1280-81. To be sure, the Court need not "certify that it believes its ruling to be erroneous" to find "substantial questions of law;" and the appellate court may find a question to be "substantial" even though it might ultimately affirm on the merits of the appeal. *Id*. at 1281. In short, a substantial question is only "a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal or could satisfy one of the other conditions." *Garcia*, 340 F.3d at 1020 n.5.

That "second part of the requirement—that the question be likely to result in reversal, a new trial, a non-prison sentence, or a sentence reduced to less than the time that would be served by the end of the appeal process—concerns only the *type* of question that meets the requirement." *Garcia*, 340 F.3d at 1021 n.5 (emphasis added). That is, the court need not determine that an appellate issue is likely, on the merits, to result in reversal, but that the question on appeal is the kind of question that, if decided in the defendant's favor, would require a retrial (or another listed outcome). *Id*.

Thus, Mr. Chrismas need only demonstrate that he will raise a non-frivolous, fairly debatable issue on appeal, and that it is the kind of issue that would, if successful, result in a reversal, a new trial, a sentence that does not include imprisonment, or a reduced sentence to a term less than any time already served plus the expected duration of the appeal process. Mr. Chrismas meets this standard and should be granted bail pending appeal.

3

## III.    ARGUMENT

### A.    Mr. Chrismas is not a flight risk or a danger to the community.

Mr. Chrismas' continued bond pending appeal raises no issues of flight risk or danger to the community.

Mr. Chrismas is 80 years old, self-employed, and deeply rooted in Los Angeles. Though he was born in Canada, he has lived in Los Angeles since in the 1960s. He has been on bond and under supervision for three-and-a-half years since his initial appearance in July 2021. Mr. Chrismas has never missed a court appearance, and he surrendered his passport to defense counsel. Mr. Chrismas has performed well under supervision, with a single violation (that related neither to flight risk nor danger to the community), which this Court ameliorated with a monthly financial reporting condition. (*See* Dkt. Nos. 115, 124, and 140.) Pretrial Services has never recommended detention for Mr. Chrismas and has never expressed any concerns of flight or safety. (Dkt. No. 122 at 10.)

Finally, this Court has already found Mr. Chrismas meets this standard[3] when, at sentencing, it denied the government's requests for immediate remand *and* to add a location monitoring condition to Mr. Chrismas' bond (based on purported flight risk), allowing Mr. Chrismas to self-surrender on February 17, 2025 under the same bond conditions previously set by this Court. (Dkt. No. 242.)

Based on this record, there is clear and convincing evidence that Mr. Chrismas does not pose a flight or safety risk.

---

[3] The "clear and convincing" standard for safety and flight that applies to release pending appeal *also* applies to defendants released pending imposition or execution of a sentence. *See* 18 U.S.C. § 3143(a). Mr. Chrismas has been on release under this standard pending the imposition of his sentencing (then unopposed by the government) and continues his release under this same standard pending execution of his sentence.

**B.    Mr. Chrismas' appeal is not a delay tactic and will raise substantial questions that, if decided in his favor, would result in reversal or a new trial.**

Mr. Chrismas raises three substantial and legitimate questions of law that each independently warrant bond pending appeal. He has made these arguments repeatedly throughout this hard-fought litigation, showing these issues are raised not to delay but to seek redress.

### 1.    Jury Instructions and Constructive Amendment

<u>**First**</u> is the central issue of the government's disputed trial theory—that transfers without bankruptcy court permission are enough to convict a person for bankruptcy embezzlement under 18 U.S.C. § 153, regardless of whether the transfers were made "for one's own use." In embracing this theory, the Court adopted the government's version of the jury instructions (excising the statutory "for one's own use" language) and granted the government's motion *in limine* to exclude Mr. Chrismas' defense (that "for one's own use" was a required element). If these jury instructions were error, then the government also constructively amended the indictment by broadening the theory on which a jury could convict Mr. Chrismas, both of which require reversal.

**As for the jury instructions**: "An error in describing an element of the offense in a jury instruction is harmless [therefore not requiring reversal] *only* if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *See United States v. Munguia*, 704 F.3d 596, 603-04 (9th Cir. 2012) (emphasis added) (citation omitted). Mr. Chrismas has always maintained that 18 U.S.C. § 153 requires as an essential element of proof that the defendant intended the appropriation (or transfer, embezzlement or spending) for one's "own use," rather than for the use or benefit of the estate. (*See, e.g.*, Dkt. Nos. 117, 153 and related briefing, 166, 194.) At first, the government shared this interpretation, before pivoting at trial. (*See* Dkt. No. 194 at ECF 12-14, summarizing the government's last-minute change in theory.)

When the Government abandoned its original theory and pursued its new "guilty by transfer without permission" theory, the parties heavily litigated the permissible defenses

5

and jury instructions. The parties and the Court looked to higher authority for guidance, but the landscape was a desert. The Court recognized, "Because the Ninth Circuit has no available case law interpreting 18 U.S.C. § 153, the Court turns to a sister circuit to discern whether Defendant's proffered defense is legally available." (Dkt. 153 at 12; *see also* Jan. 13, 2025 audio from sentencing hearing at 28:45, government acknowledging that "throughout this proceeding, we've had very little caselaw to go off of under 18 U.S.C. § 153.) Even back then, this Court recognized that the jury instruction issue was primed for Ninth Circuit review: "THE COURT: . . . If we decide [the jury instruction] wrong, then it will be a good issue for appeal." May 29 PM Trial Tr. at 116:13-14. (To be sure, the Ninth Circuit does not have a model jury instruction for 18 U.S.C. § 153.)

At trial, the government successfully moved to exclude Mr. Chrismas' "for one's own use" defense, including excluding evidence that showed Mr. Chrismas' transfers in fact benefited the estate. The government then focused its closing on the lack of court permission for the transfers. (*See* Dkt. 194-9, May 31 AM Tr. at 42:21-23, the government arguing that Count 1 was "easiest" because Mr. Chrismas transferred $50,000 directly from an ACE Gallery account to an ACE Museum account, "and the Bankruptcy Court was none the wiser." Note, the Gallery was the estate, and the Museum was the largest asset of that estate).

On this record, it is fairly debatable that Mr. Chrismas raises a substantial issue of jury instruction error on appeal; that the government will not be able to meet its burden that it is clear beyond a reasonable doubt that the missing "for one's own use" element in the

DEFENDANT'S *EX PARTE* APPLICATION FOR AN ORDER FOR BOND PENDING APPEAL

1  jury instruction was harmless; and that a new trial is warranted.[4] *See, e.g., Munguia*, 704

2  F.3d at 605 (under similar circumstances involving competing legal theories, reversing

3  conviction after finding the jury instruction was erroneous and not harmless).

4      **The constructive amendment issue is tied to the jury instructions**. If the defense

5  is correct — that the "for one's own use" element is required for a conviction (*i.e.*, it

6  modifies "transfer[]," "appropriate[]," etc.) — then the government constructively amended

7  the indictment by removing it from its burden of proof at trial. Given that the government

8  initially relied on the Eleventh Circuit Model Jury Instruction (which included the "one's

9  own use" theory), and its filings confirmed that it had proceeded on that theory before trial

10  (Dkt. No. 194 at ECF 12-14), it is a fair inference that the government also presented that

11  theory to the grand jury. This means the government most likely indicted Mr. Chrismas on

12  the theory that Mr. Chrismas transferred funds *for his own use*. In other words, it is a fair

13  inference that the grand jury, like the Eleventh Circuit, understood "for one's own use" as

14  the defense does, that is, as a concept applying to all the verbs in the statute. Yet during

15  trial, the jury was permitted (and instructed) to convict if it found Mr. Chrismas transferred

16  funds *without court permission*. This more lax theory is not the one presented to the grand

17  jury.

18      The government should have been required to prove everything it committed itself to

19  proving in the indictment—it should have been required to prove Mr. Chrismas transferred

20  money "for his own use." Instead, it was permitted to present a broader theory to the jury

21  through jury instructions which omitted the *mens rea* element of transfer for "one's own

_____

23  [4] Indeed, this Court at sentencing varied downward from its calculated guidelines of 121

24  months to 24 months *because* case is different from fraud cases usually before the Court.
   Whereas, the Court explained, the usual case involves defendants enhancing their own

25  lifestyle, the Court did not see that here. (Jan. 13, 2025 audio from sentencing hearing
   beginning at 42:48.) Chances are, if the jury was instructed that the transfers had to be for

26  "one's own use" to be criminal, the jury likely would have seen Mr. Chrismas made the

27  transfers for the benefit of the estate and *not* for his "own use." This would have resulted in
   an acquittal, meaning the instruction error was not harmless.

1  use." It is therefore fairly debatable that Mr. Chrismas' conviction is based on conduct not
2  charged in the indictment.

3       If this issue is successful on appeal (which, again, is unnecessary for the court to find
4  here), reversal is required. *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006); *see*
5  *also United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (constructive amendment
6  where the crime charged in the indictment was substantially altered at trial, so that it was
7  impossible to know whether the grand jury would have indicted for the crime actually
8  proved) (quotations and modifications omitted).

9              ## 2.    Improper and Unnoticed Expert Testimony

10  **Second** is the issue of David Richardson's testimony, which the defense maintains
11  was unnoticed expert testimony. "The erroneous admission of expert testimony is subject to
12  harmless error review, just like all other evidentiary errors." *United States v. Wells*, 879
13  F.3d 900, 923 (9th Cir. 2018) (citations omitted). Where expert testimony has been
14  erroneously admitted, there is a "presumption of prejudice," and the Government "must
15  show that it is more probable than not that the jury would have reached the same verdict if
16  the evidence had not been admitted." *Id*. at 923-24. "A non-harmless *Daubert* error"
17  requires reversal with a discretionary remedy "as may be just under the circumstances."
18  *United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020). "Circumstances may require a
19  new trial in some instances; circumstances may dictate a limited remand in others." *Id*.

20       Though the Court instructed that Richardson's testimony "should only reflect his
21  personal understanding" (Dkt. No. 238 at 16), testimony based on "personal understanding"
22  may nonetheless constitute expert testimony because the understanding itself arises from
23  specialized knowledge, which is subject to the Court's *Daubert* gatekeeping functions.
24  Here, Richardson testified about the "diversion" of $14 million, a heavily contested topic
25  subject to dueling experts in the underlying bankruptcy case; and he testified about ACE
26  Gallery's "ordinary course of business" – a legal term whose meaning would dictate
27  whether the bankruptcy court permission (central to the government's theory of guilt) was
28  even *required* by bankruptcy rules for the charged transfers in the first place. This

testimony was not based on Richardson's personal perceptions but his 30 years of experience as a bankruptcy lawyer (which gives him knowledge of technical bankruptcy concepts) and his professional work on the underlying bankruptcy case. (*See* Dkt. Nos. 194 and 212.) It is this kind of "specialized knowledge" that is prohibited in lay person's testimony. *See* Fed. R. Evid. 701 (testimony of a lay witness must be limited to what is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702").

It is at least fairly debatable that this testimony was subject to the notice and gatekeeping requirements of Rule of Criminal Procedure 16 and Rule of Evidence 702. *See, e.g.*, *United States v. Vega*, 813 F.3d 386, 395 (1st Cir. 2016) (holding that testimony fell "outside the boundaries of lay expertise" where the witnesses could "form their opinions only by understanding technical Medicare laws and regulations;" acquiring such knowledge through their occupations "does not make it 'personal knowledge' qualifying as lay expertise under Rule 701"); *United States v. Willner*, 795 F.3d 1297, 1316 (11th Cir. 2015) (similar reasoning); *United States v. White*, 492 F.3d 380,403-04 (6th Cir. 2007) (similar reasoning); *Bank of China, N.Y. Branch v. NBM LLC (Bank of China)*, 359 F.3d 171, 181 (2d Cir. 2004) ("The admission of this [an employee-banker's] testimony pursuant to Rule 701 was error because it was not based entirely on Huang's perceptions.").

And as this Court has acknowledged, without Richardson's testimony, the Government's case was at best "circumstantial." (Dkt. No. 238 at 16-17.) Thus, it is also fairly debatable that the Government will not be able to overcome a presumption of prejudice; it will not be able to show it is more probable than not that the jury would have reached the same verdict if the evidence had not been admitted. *See, e.g.*, *United States v. Sarkissian*, 755 F. App'x 613 (9th Cir. 2018) (plain error requiring reversal and a new trial when district court admitted testimony from witnesses who testified as to both facts and opinions, failed to instruct the jury on how to evaluate such dual witnesses, the record was too sparse to determine whether the witnesses were qualified, and the error may have substantially swayed the jury in convicting defendant); *United States v. Vera*, 770 F.3d

9

1232, 1243 (9th Cir. 2014) (plain error requiring reversal in failing to instruct a jury on how to evaluate an agent's dual lay and expert testimony, and in failing to assess the foundation and reliability of the agents expert testimony).

### 3.    Incorrect Guideline Calculation

**Third**, at sentencing, the Court tabulated the loss amount by adopting the sum total of funds transferred without bankruptcy court permission, regardless of the Guidelines' definition of "loss" and the Guidelines' requirement that loss be offset by eligible credits. If Mr. Chrismas is successful in appealing the Court's loss calculation, then the new loss amount would be zero dollars and would result in a Guidelines sentence of no imprisonment.

Under Section 2B1.1 of the 2018 Guidelines, actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1(b)(1), comment. (n.3(A)(i)) (2018).[5] Intended loss is the "pecuniary harm that the defendant purposefully sought to inflict." *Id*. at n.3(A)(ii). The Guidelines also require credit against any loss calculation reflecting the fair market value of property returned and services rendered before the offense was detected. USSG § 2B1.1(b)(1), comment. (n.3(D))

Here, at sentencing, the Court found a loss amount of $12,809,192. (See Jan. 13, 2025 audio recording of sentencing hearing at 33:32-34:03.) The defense argued loss was zero, whether because the government failed to meet its burden to show loss greater than zero, or because credits against any loss amount (such as money returned to the estate) would reduce it to zero. (*See* Dkt. 232, Defendant's PSR Objections; *see also* Dkt. No. 233, Defense Sent. Memo.; *see also* Dkt. 234, Defense's Objections to Gov. Sent. Pos.)

---

[5] Whether the definition of "loss" includes "intended loss" in addition to "actual loss" depends on which version of the Guideline is applied. Mr. Chrismas argued at sentencing for application of the 2018 version, confining the definition to "actual loss." (*See* Dkt. 232, Defendant's PSR Objections). However, even if the Court considers "intended loss" under newer versions of the Guidelines, the arguments contained herein are the same.

10

1    The Court did not perform its own calculations but adopted the figures from the PSR

2    (Dkt. No 236, Amended PSR at ¶ 18), which borrowed its number from the government

3    (Dkt. No. 228, Gvt's Objection to PSR at pp 2-3), which borrowed its number from an

4    expert retained by Mr. Chrismas' bankruptcy adversaries who calculated damages in a

5    separate civil case. (*See* Dkt. No. 231-3, Gov. Sent. Pos., Ex. 2, Ziegler Report.) That

6    expert was not retained by the government, did not testify at trial or at sentencing, and did

7    not consult or adopt the United States Sentencing Guidelines on loss to inform her expert

8    opinion. Her task was simply to add up every ACE Gallery dollar routed through ACE New

9    York and ACE Museum accounts without bankruptcy court approval, no matter how those

10   dollars were ultimately spent and regardless of whether the money ultimately came back

11   into the estate. (*See id.*)

12       The Court also did not reduce the loss amount it found by "the fair market value of

13   the property returned and the services rendered" to the estate by Mr. Chrismas. *See* USSG §

14   2B1.1(b)(1), comment. (n.3(D) (2024). For example, the Court did not address the

15   government's lack of evidence about the ultimate use of the transferred funds, and the

16   Court failed to wrestle with defense's affirmative evidence that most (if not all) payments

17   were routed back to the estate, or used to make payments on behalf of the estate, or

18   otherwise conferred a monetary value on the estate through the Museum. (*See* Dkt. 232,

19   Defendant's PSR Objections, elaborating on the issue; *see also* Dkt. No. 233, Defense Sent.

20   Memo.)

21       "Lack of Bankruptcy Court approval" on its face does not address the required

22   credits necessary to calculate "pecuniary harm" under the Guidelines, *see* USSG §

23   2B1.1(b)(1), and it is reversible error to import a concept from a civil case which "has no

24   place" in the Guidelines calculation absent some actual explanation of why the Court

25   believed the calculus was appropriate here. *See United States v. Avenatti*, Ninth Cir. Case

26   No. 22-50301 (Memorandum issued Oct. 23, 2024) (vacating and remanding for

27   resentencing for errors in the loss and Guidelines calculations based in part because the

28

11

district court applied a concept (forfeiture) to calculate loss which it found "has no place in calculating 'actual loss.'")

At a minimum, it is fairly debatable that the guidelines were calculated in error based on the $12.8 million loss amount; and that success on appeal will result in the appellate court either vacating Mr. Chrismas' sentence on a finding that no pecuniary harm occurred for purposes of the loss enhancement, or remanding for resentencing on the loss amount. A loss of zero, as Mr. Chrismas asserts, would put Mr. Chrismas' base offense level at 6, which results in a Guidelines range in Zone A of the sentencing table, and which will mean probation is authorized under Section 5B1.1. (*See* Dkt. No. 233 at 23-24, summarizing calculation). Because this result would mean a sentence that does not include a term of imprisonment, bond pending appeal of the sentence alone is warranted. See 18 U.S.C. § 3143(b)(1)(B)(iii).

## IV.  CONCLUSION

For the reasons outlined above, Mr. Chrismas does not pose a flight or safety risk, and he intends to raise substantial questions of law on appeal that will require reversal or a new trial or a sentence of non-imprisonment if he is successful. If the Court agrees, release pending appeal is mandatory. *See* 18 U.S.C. § 3143(b)(1) ("If the judicial officer makes such findings, such judicial officer *shall* order the release…") (emphasis added). Mr. Chrismas respectfully requests that this Court permit him to remain released on the same bond conditions already imposed by this Court while he pursues his appeals.

DEFENDANT'S *EX PARTE* APPLICATION FOR AN ORDER FOR BOND PENDING APPEAL